# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**BOSTON GRAND PRIX, LLC**,                                 Chapter 11
     Debtor                                        Case No. 16-12574-MSH

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**GARY W. CRUICKSHANK, Chapter 7 Trustee,**
     Plaintiff
v.                                                         Adv. P. No. 17-1115-JNF
**GEORGE R. ROBERTS COMPANY,**
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion of the Defendant, George R. Roberts

Company (the "Defendant" or "GRRC"), for Partial Summary Judgment with respect to

the Complaint filed by Gary W. Cruickshank, the Chapter 7 Trustee (the "Plaintiff" or the

"Trustee") of Boston Grand Prix, LLC (the "Debtor" or "BGP") to avoid two allegedly

preferential transfers made by checks payable to GRRC in the total amount of $278,326.63,

both of which cleared the Debtor's bank on April 25, 2016, less than ninety days prior to

the petition date.  Pursuant to its Motion, the Defendant seeks partial summary judgment

with respect to two defenses it has raised to the Plaintiff's preferential transfer claims: 1)

whether, pursuant to 11 U.S.C. § 547(c)(4), the Defendant's delivery of concrete race

blocks with a value of $99,330.00 constituted "new value" to the Debtor after its receipt

of Check No. 1051 and Check No. 1042 from the Debtor on April 22, 2016; and 2) whether,

pursuant to 11 U.S.C. § 547(c)(2), Check No. 1051 in the amount of $128,326.63 from the

Debtor to GRRC was in payment of a debt incurred by the Debtor in the ordinary course

of business and was made in the ordinary course of business between the Debtor and

GRRC.

For the reasons set forth below, the Court shall enter an order granting the Motion

for Partial Summary Judgment in part with respect to GRRC's new value defense and

denying it in part with respect to its ordinary course of business defense.  With respect to

the latter defense, the Court concludes that there are genuine issues of material fact that

preclude entry of summary judgment.

## II. UNDISPUTED FACTS

On July 5, 2016, the Debtor filed a voluntary petition for relief under Chapter 7 of

the Bankruptcy Code.  Gary W. Cruickshank, Chapter 7 Trustee of BGP, commenced this

Adversary Proceeding against GRRC by filing the Complaint on September 13, 2017.

Pursuant to 11 U.S.C. §§ 547, 550, and 551, the Plaintiff through his Complaint seeks to

avoid and recover two allegedly preferential transfers made by the Debtor to GRRC in

the amounts of $128,326.63 (Check No. 1051) and $150,000.00 (Check No. 1042), for a total

of $278,326.63.  GRRC filed its Answer to the Complaint on October 10, 2017 and moved

for partial summary judgment on May 18, 2018.

GRRC is located in Alfred, Maine.  It manufactures precast and custom concrete

products for residential and commercial customers.  It has operated for more than 50

2

years and has 35-40 employees. Steve Ray ("Ray") is the President of GRRC and oversees GRRC's day-to-day business operations. He was responsible for overseeing its business relationship with the Debtor. Before entering into a contract with the Debtor, GRRC had never fabricated or sold race barriers.

In May 2015, the Debtor entered into agreements with the City of Boston and IndyCar, pursuant to which the Debtor agreed to organize and operate a car race for a five-year period. The Debtor intended to construct a 2.2 mile racetrack on the South Boston Waterfront encircling the Boston Convention Center. The race was scheduled to run each Labor Day weekend beginning in 2016. John F. Casey ("Casey") was the Debtor's chief executive officer.

In late 2015, according to Ray, the Debtor began negotiating to purchase custom-made concrete race blocks from GRRC (the "Race Blocks" and, each individually, a "Race Block"). The Race Blocks were intended to be used for the Debtor's construction of the anticipated Boston Grand Prix race track. In late 2015, GRRC submitted a proposal to the Debtor (the "Proposal") setting forth terms for the sale of Race Blocks. The Debtor executed a purchase order affirming the terms of the Proposal (the "Purchase Order"). Ray determined the invoice price for the Race Blocks based upon his knowledge of the precast industry and from quotes received from vendors for the items to be used to fabricate the barriers.

Through the Proposal and Purchase Order, the Debtor agreed to purchase, and GRRC agreed to manufacture and deliver, three types of custom-made Race Blocks in varying quantities: 2,200 "straight" Race Blocks; 100 "radius" Race Blocks; and 110 "pit"

Race Blocks.  According to the Proposal and Purchase Order, the Debtor agreed to pay to GRRC $944.00 for each straight Race Block; $979.00 for each radius Race Block; and $675.00 for each pit Race Block. GRRC's contract with the Debtor represented over 25% of GRRC's projected revenue in 2016.  It had never entered into a contact of that magnitude before.

During the course of its relationship with the Debtor, GRRC maintained a "shipping log" (the "Shipping Log"), the accuracy of which the Plaintiff does not admit,[1] that tracked every shipment of Race Blocks that GRRC delivered to the Debtor, including, for each shipment, the date of delivery, the quantity of Race Blocks that were delivered by type of Race Block, and the truck driver who made the delivery.

GRRC also maintained contemporaneous "pick tickets," the accuracy of which the Plaintiff does not admit,[2] describing the quantity and timing of every shipment to the Debtor. The pick tickets were compiled by GRRC and kept with the invoice in which the deliveries identified in the pick tickets were billed to the Debtor.  Starting on January 27, 2016, as new Race Blocks were manufactured, GRRC delivered by truck certain Race Blocks on an ongoing basis to a storage lot in Boston, Massachusetts, operated by the Massachusetts Port Authority (the "Lot").  The Race Blocks were delivered to the Lot at

---

[1] The Plaintiff pointed to no evidence that would suggest that the shipping logs were inaccurate.  Accordingly, the Court concludes that GRRC's statement of this material fact is undisputed.

[2] The Plaintiff pointed to no evidence that would suggest that the pick tickets were inaccurate.  Accordingly, the Court concludes that GRRC's statement of this material fact is undisputed.

4

the instruction and agreement of the Debtor.  GRRC delivered the Race Blocks either

through its own drivers or by hiring third party drivers from Casco Bay Transportation.

According to Ray, each set of Race Blocks that was shipped from GRRC's office in Maine

was delivered to the Lot in Boston on that same day.[3]  Every Race Block was delivered in

a condition consistent with the terms of the Proposal and Purchase Order and was

intended to be used for the Debtor's construction of the anticipated Boston Grand Prix

race track.  According to Ray, the Race Blocks were described by a consultant working

for the Debtor as "the finest race blocks they had ever seen made."

According to the Defendant, during its relationship with BGP, it typically invoiced

the Debtor on a weekly basis for all of the Race Blocks that it had delivered in the prior

week.  GRRC issued 14 invoices to the Debtor with dates ranging from January 29, 2016

to April 30, 2016 as follows:

| Invoice No. | Due Date | Invoice Amount |
|---|---|---|
| 56138 | 1/28/16 | $28,084.00 |
| 56148 | 2/5/16 | $42,126.00 |
| 56157 | 2/12/16 | $34,102.00 |
| 56147 [actually 56174] | 2/22/16 | $14,042.00 |
| 56197 | 2/26/16 | $78,234.00 |
| 56213 | 3/7/16 | $48,144.00 |
| 56231 | 3/14/16 | $80,240.00 |
| 56246 | 3/19/16 | $136,928.63 |
| 56267 | 3/28/16 | $133,399.00 |
| 56290 | 3/31/16 | $108,275.13 |
| 56343 | 4/13/16 | $128,326.63 |
| 56383 | 4/18/16 | $109,046.50 |
| 65434 | 4/25/16 | $108,324.00 |
| 56495 | 4/30/16 | $56,168.00 |

---

[3] The Plaintiff failed to point to any evidence that would contradict Ray's deposition
testimony.

The invoices sent to the Debtor for Race Blocks delivered between April 25, 2016 and April 29, 2016 were issued with a "NET DUE 30" payment term, meaning that payment was required within 30 days of receipt of the invoice.  Indeed, all of GRRC's invoices to the Debtor contained the "NET DUE 30" payment term. The 30-day payment term also was included in the Proposal and Purchase Order, and all invoices included the same per-Race Block cost agreed to in the Proposal and Purchase Order, namely $944.00 per straight Race Block, $979.00 per radius Race Block, and $675.00 per pit Race Block.

The Debtor made the following payments to GRRC:

| Check Clear Date | Check No. | Bank Account | Amount |
|---|---|---|---|
| 3/24/16 | 1005 | Leader Bank | $48,144.00 |
| 4/5/16 | 1025 | Leader Bank | $133,399.00 |
| 4/25/16 | 1051 | Leader Bank | $128,326.63 |
| 4/25/16 | 1042 | Leader Bank | $150,000.00 |

The payments represented by Check Numbers 1051 and 1042 cleared the Debtor's bank account within the preference period.

On March 23, 2016, GRRC received Check No. 1005, dated March 22, 2016, by mail from the Debtor in the amount of $48,144.00.  GRRC applied Check No. 1005 to Invoice No. 56213, dated March 7, 2016.  The length of time between the invoice date and the check delivery date was 16 days; the length of time between the invoice date and the date the check cleared was 17 days.  At the time GRRC applied this payment to invoice number 56213, there were five older invoices outstanding totaling $196,588.00 (56138, 56148, 56157, 56147 [sic], and 56197).

6

On April 2, 2016, GRRC received Check No. 1025, dated March 31, 2016, from the

Debtor by mail in the amount of $133,399.00.  GRRC applied Check No. 1025 to Invoice

No. 56267 in the amount of $133,399.00, dated March 28, 2016.  The length of time between

the invoice date and the check delivery date was 5 days; the length of time between the

invoice date and the date the check cleared was 8 days.  At the time that GRRC applied

this payment to invoice number 56267, there were seven older unpaid GRRC invoices

totaling $461,900.63 (invoice numbers 56138, 56148. 56147 [sic], 56197, 56213, 56231, and

56246).

According to Ray, he communicated by email and telephone with Casey in order

to encourage Casey to make payments on outstanding invoices before Check No. 1005

and Check No. 1025 were received.  Ray contacted Casey by email on March 18, 2016,

before Casey sent Check No. 1005, and Ray called Casey on March 29, 2016, to request

payment shortly before Casey sent GRRC Check No. 1025.[4]  Additionally, on April 19,

2016 at 11:31 a.m., Ray emailed Brian Hughes ("Hughes"), a consultant for the race track

construction, stating, among other things:  "Also, I haven't heard from John [Casey].

There is now $280,357.63 that is 30 days or older. We need some money soon. Anything

you can do is appreciated. Thanks!"  On April 19, 2016 at 1:22 p.m., Ray emailed Hughes

as follows: "Looks like payment isn't an issue unique to GRRC.  John still hasn't called (I

---

[4] The Plaintiff admits that Ray emailed Casey on March 18, 2016 and wrote the words
contained in Exhibit 12 to the Ray Affidavit. The Plaintiff admits that Ray states in his
Affidavit that he called Casey on March 29, 2016 to request payment but does not admit
the truth of the statement.  The Plaintiff, however, failed to point to any evidence that
would create a genuine issue of material fact.

left a message with Megan (sp?) yesterday and again this morning) or returned any emails even though I know he has read them. Getting concerned!"  On April 20, 2016 at 1:22 p.m., Ray sent an email to Casey with the subject line "Payment—Grand Prix Race Blocks" which stated:

> I just left a message on your cell phone with this information. Grand Prix Boston now owes George Roberts $280,357.63 that is over 30 days old. I have left many messages and sent you several emails regarding posting the last payment and scheduling future payments. I have not heard back from you in either case. I will be stopping production of the race blocks until we can work things out unless I hear from you today or tomorrow. I would like to drive down there, pick up a check and sit down with you (and anyone on your staff that may take care of Accounts Payable) to work out a payment schedule. You are receiving invoices from us once a week and each invoice is over $100,000. I need to make sure that the company I run is able to make our commitments. You can call me anytime on my cell phone. . . .

During this period when Ray was calling and emailing Casey about past-due payments, GRRC needed the money for its cash flow.  Indeed, the Debtor's failure to pay GRRC in a timely manner had a significant effect on its cash flow and caused it problems in paying its own vendors on time.

The Debtor issued Check No. 1051, dated April 20, 2016, in the amount of $128,326.63.  GRRC received Check No. 1051 in the mail on April 22, 2016, and GRRC deposited Check No. 1051 in GRRC's bank account that same day.  Casey, on behalf of the Debtor, included Invoice No. 56343 in the amount of $128,326.63 in the package he sent containing Check No. 1051 in the same amount.  Thus, the amount of Check No. 1051

matched the amount of Invoice No. 56343 dated April 13, 2016.[5]  Check No. 1051 cleared

the Debtor's bank account on April 25, 2016.

According to GRRC, although it discussed applying Check No. 1051 in the amount

of $128,326.63 to Invoice No. 56246 (dated March 19, 2016 in the sum of $136,928.63), it

ultimately allocated Check No. 1051 to Invoice No. 56343, which was dated April 13, 2016

in the amount of $128,326.63, for purposes of its internal accounts-receivable.[6]

If Check No. 1051 were applied to invoice 56246 dated March 19, 2016 as the

Plaintiff contends, the length of time between the invoice date and the check delivery date

---

[5] Ray in an email to Casey dated April 25, 2016 stated:

> I want to let you know how we applied the two checks that I picked upon
> Friday.  First the check that was mailed for $128,326.63 and you enclosed
> invoice # 56343 to apply it to.  That invoice wasn't actually due until May
> 13th, so we applied that payment to invoice #56246 for $136,928.63 leaving
> a balance due of $8,602.00.  As for the check that I picked up for $150,000,
> we applied that to the (5) oldest invoices . . .

The Plaintiff asserted that by email dated May 3, 2016 and letter dated May 3, 2016, Ray
again informed Casey that Roberts applied Check No. 1051 to Invoice 56246 [in the
amount of $136,928.63]."

[6] The Plaintiff disputes this statement, stating the following:

> GRRC applied check no. 1051 in the amount of $128,326.63 to invoice 56246
> in the amount of $136,928.63 [leaving a balance of $8,602.00]. By email on
> April 25, 2016 and by letter and electronic mail on May 3, 2016, GRRC
> reported its application of check no. 1051 to invoice 56246 [dated March 19,
> 2016]. Moreover, in the days and hours leading up to the receipt of this
> check, Ray was asserting that Roberts needed to be paid for the $280,000 in
> past due invoices it had issued.  Invoice number 56346 was not a past due
> invoice.

The Defendant contends that the dispute is immaterial.  The Court disagrees.

was 34 days; the length of time between the invoice date and the date the check cleared was 37 days.  If Check No. 1051 were applied to Invoice No. 56343 in the amount of $128,326.63, dated April 13, 2018, as the Defendant now contends, the length of time between the invoice date and the check delivery date was 9 days and the length of time between the invoice date and the date the check cleared was 12 days.

The Debtor issued Check No. 1042, dated April 21, 2016, in the amount of $150,000.00.  Ray picked up Check No. 1042 from the Debtor's office in Boston, Massachusetts, on April 22, 2016, and GRRC deposited Check No. 1042 in its bank account that same day.  Check No. 1042 cleared the Debtor's bank account on April 25, 2016.  GRRC applied the $150,000 to the oldest unpaid invoices as follows:

> Invoice #56138 for $28,084.00—Paid Complete
> Invoice #56148 for $42,126.00—Paid Complete
> Invoice #56157 for $34,102.00—Paid Complete
> Invoice #56174 for $14,042.00—Paid Complete
> Invoice #56197 for $78,234.00—Paid $31,464.00, leaving a balance of $46,588.

Before receiving Check No. 1051, as noted above, Ray emailed Casey on April 20 and 21, 2016 regarding payment on various outstanding invoices, and he left a voicemail for Casey on April 20, 2016.  On April 21, 2016 at 4:49 p.m., Ray re-sent his 1:22 p.m. email from April 20, 2016 to Casey, reproduced above, with the note "John, please see email below and respond accordingly."  On April 21, 2016 at 5:21 p.m., Ray re-sent his 1:22 p.m. email from April 20, 2016 to Casey.

Before receiving Check No. 1051, Ray spoke on the phone to Casey on the evening of April 21, 2016, when Casey called Ray to discuss the Debtor making upcoming

payments, including Check No. 1051, shortly after Ray's follow up email. Ray told Casey during the call that GRRC was going to stop production of the Race Blocks unless they worked something out. During their call on April 21, 2016, Casey told Ray that he had put a check in the mail to GRRC in the amount of approximately $128,000. Ray responded to Casey that $128,000 was not enough money, and that GRRC needed an additional $150,000. Casey said he would cut a check for $150,000 and mail it to GRRC. Ray asked Casey not to mail the $150,000 check, and stated that he would drive to Boston to pick it up. Ray drove to Boston the next morning, on Friday, April 22, 2016, and arrived at the Debtor's office at approximately 8:00 a.m., which was when he was told that the BGP office would open. When Ray arrived, no one was at the BGP office. At 8:15 a.m., a woman arrived, although John Casey was not there and she did not know where he was. Ray informed the employee that John Casey was supposed to cut him a check for $150,000. She looked around until she found it, and gave it to Ray.

While Ray was intent on obtaining payment for the Race Blocks it had manufactured and delivered, Casey, according to Michael G. Morris, formerly a managing member of Outside In Advisors, LLC, which provided consulting services to the Debtor, represented that "on or about April 12, 2016, Casey indicated via email that he had decided to move the race from Boston to Las Vegas" due to exorbitant costs associated with fees, force accounts and letters of credit required by various agencies of the Commonwealth. Nevertheless on April 12, and April 13, 2016, Casey, on behalf of the Debtor, signed contracts with the City of Boston, the Massachusetts Port Authority, the Massachusetts Convention Center Authority, the Massachusetts Department of

11

Transportation, and the Massachusetts Bay Transportation Authority which required expenditures exceeding $13 million, although its bank balance on April 22, 2016 was $1,303,048.87.

Between April 25, 2016, and April 29, 2016, GRRC delivered 105 Race Blocks to the Debtor with a value of $99,330.00. The Race Blocks delivered from April 25, 2016, to April 29, 2016, were not secured by an otherwise unavoidable security interest, and the Debtor did not make any other transfers on account of the delivered Race Blocks.

On May 3, 2016, Ray sent an email and a letter to Casey attaching copies of all invoices with a note on each invoice indicating the due date, the amount paid and the amount due. In the May 3, 2016 email and letter, Ray also stated that: (i) Check No. 1051 in the amount of $128,326.63 was applied to invoice #56246 in the amount of $136,928.63; and (ii) Check No. 1042 in the amount of $150,000 was applied to the GRRC's oldest unpaid invoices. Ray also disclosed that after the cancelation of the race, GRRC had in its inventory 80 straight Race Blocks, 15 radius Race Blocks and 28 pit Race Blocks. Thus, following cancellation of the race, GRRC had 123 Race Blocks remaining at its business premises which it attempted to sell. On October 21, 2016, it sold 28 pit Race Blocks for $100 per Race Block; on October 31, 2016, it sold 9 straight Race Blocks for $200 per Race Block; on May 31, 2017, it sold 60 straight Race Blocks for $280 per Race Block; and on September 27, 2017, it sold 5 radius Race Blocks for $280 per Race Block.

The Chapter 7 Trustee engaged Paul E. Saperstein Co., Inc. ("Saperstein") to conduct an auction of the Debtor's assets including 1,100 Race Blocks. Despite extensive marketing efforts, Saperstein was able to sell only 324 Race Blocks to Watkins Glen

12

International, which runs NASCAR races at its facility, for $25 per Race Block for a total price of $8,100. Saperstein was unable to sell 776 Race Blocks.

## III. POSITIONS OF THE PARTIES

### A. The Defendant

As noted above, the Defendant seeks partial summary judgment with respect to its defenses to the Plaintiff's complaint seeking the avoidance and recovery of preferential transfer, arguing that (1) it is undisputed that GRRC delivered $99,330.00 in "new value," measured by the total invoice price of the Race Blocks that GRRC delivered to the Debtor between April 25, 2016, and April 29, 2016, after it received Check No. 1051 and Check No. 1042 from the Debtor on April 22, 2016, *see* 11 U.S.C. § 547(c)(4); and (2) that it is undisputed that Check No. 1051 in the amount of $128,326.63 from the Debtor to GRRC was in payment of a debt incurred by the Debtor in the ordinary course of business and was made in the ordinary course of business between the Debtor and GRRC. *See* 11 U.S.C. § 547(c)(2).[7]

GRRC prefaces its argument that it provided new value to the Debtor by observing that 1) when payment is tendered by check, the relevant date under § 547(c)(4) for determining when the payment occurs is the time at which the creditor received the check, *see* Barnhill v. Johnson, 503 U.S. 393, 402 n.9 (1992) (transfer made by check is

---

[7] As noted, the Court concludes that genuine issues of material fact exist that warrant denial of GRRC's ordinary course of business defense under 11 U.S.C. § 547(c)(2). In particular, a factual issue exists as to whether Check No. 1051 in the amount of $128,326.63 was applied to Invoice No. 56343 in the amount of $128,326.63 or to Invoice No. 56246 in the amount of $136,928.63.

deemed to occur on date check is honored, rather than date of payee's receipt of check for preference purposes for purposes of § 547(b), but acknowledging the unanimous holdings of many courts of appeal that the check receipt date—or delivery date— determines the date of transfer for preference defenses under § 547(c)); Rifken v. Entec Distrib., LLC (In re Felt Mfg. Co., Inc., No. 05-13724-JMD, 2009 WL 3348300, at *10 (Bankr. D. N.H. Oct. 16, 2009); 2) the relevant date under § 547(c)(4) for determining the time at which new value is provided by the creditor is when the new value (here, the Race Blocks) is delivered, see In re Felt Mfg. Co., Inc., 2009 WL 3348300, at *12 ("[T]he delivery date is the more appropriate measure for when new value was given[.]"); and 3) the monetary measurement of the new value provided is calculated at the time of delivery based upon the contract or invoice price of the goods that were delivered. See Gonzales v. Nabisco Division of Kraft Foods, Inc. (In re Furr's Supermarkets), 317 B.R. 423, 430, 432 (B.A.P. 10th Cir. 2004). See also Bogdanov v. Avnet, Inc., No. 10–CV–543–SM, 2011 WL 4625698, at *11 (D. N.H. Sept. 30, 2011); Gray v. Oppenheimer & Co., Inc. (In re Molten Metal Tech., Inc.), 262 B.R. 172, 176 (Bankr. D. Mass. 2001) (dollar amount of new value "should be valued at the contract rate").

GRRC states that it received Check Nos. 1051 and 1042 on April 22, 2016 and that based on the Shipping Log, Purchase Order and Proposal, invoices, and "pick tickets," it delivered 105 Race Blocks to the Debtor at invoice costs of $944.00 for straight Race Blocks, and $979.00 for radius Race Blocks between April 25 and April 29, 2016 with a value of $ 99,300.00.

14

B. <u>The Plaintiff</u>

The Plaintiff argues that the new value defense is unsupported by the facts and that "the appropriate measure of any new value provided to the Debtor after the Preferential Payments were made is not the invoice value of the concrete race barriers that Roberts' delivered, but rather, the amount by which Roberts' product replenished the Estate—a question of fact." The Plaintiff adds:

> At the time the Preferential Payments were made, BGP was already facing the insurmountable financial and legal obstacles that resulted in the official cancellation of the race only days later --such that the only value provided to the Estate, if any, was liquidation value. Moreover, for multiple reasons, the Debtor . . . never was in a position to put the barriers to any beneficial use—they were simply being stored. The contract between BGP and Roberts was for the complete set of barriers needed to hold a 2.2 mile IndyCar race in the streets of Boston. At the time the Preferential Payments were made, Roberts had manufactured and delivered less than half of the barriers that the parties contracted for and that were required to run the race. The Debtor never used the race barriers and could not have used them for their intended purpose without a complete set. Moreover, at the time the Preference Payments were made, the Debtor was not in a position to ever utilize the barriers. Even if the Court declines to utilize the liquidation value of the barriers as the appropriate measure of new value, the amount by which Roberts sold the undelivered barriers by private sale following extensive marketing efforts should be the value utilized by the Court.

The Plaintiff, citing <u>Aero-Fastner, Inc. v. Sierracin Corp. (In re Aero-Fastener, Inc.)</u>, 177 B.R. 120, 138 (Bankr. D. Mass. 1994), contends that in demonstrating new value under § 547(c)(4), the Defendant was required to prove that the value given for the Debtor's payments actually and in real terms enhanced the worth of the Debtor's estate so as to offset the reduction in the estate that the transfer caused.[8] The Plaintiff contends that the

---

[8] In <u>In re Aero-Fastner, Inc.</u>, the court observed:

invoice price of the Race Blocks based upon Ray's knowledge of the precast industry, has

no bearing on whether the Race Blocks replenished the estate.  According to the Plaintiff,

because cancellation of the race was inevitable at the time the Race Blocks were delivered

between April 25 and 29, 2016 by the Plaintiff, they had no value to the Debtor adding

that any Race Blocks delivered after the preference payments had only liquidation value.

*See* Gouveia v. RDI Grp., Inc. (In re Globe Bldg. Materials, Inc.), 325 B.R. 253, 263 (Bankr.

N.D. Ind. 2005), *aff'd*, 484 F.3d. 946, 951 (7th Cir. 2007) (noting that "[i]n principle, when

a debtor takes possession of goods from a creditor during the preference period, the value

of those goods is measured at the time the property is transferred to the debtor.").

---

The legislative history suggests that the term was defined because Congress intended "new value" to have its ordinary meaning to avoid any uncertainty or confusion surrounding the terms. H.R.Rep. No. 595, 95th Cong., 1st Sess. 372, reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6328. Moreover, the use of the term "means" rather than the word "includes" under § 547(a)(2) suggests that the definition of "new value" is exclusive and not open-ended. Durant's Rental Center, Inc. v. United Truck Leasing, Inc. (In re Durant's Rental Center, Inc.), 116 B.R. 362, 365 (Bankr.D.Conn.1990); Simon v. Engineered Protection Systems, Inc. (In re Hatfield Electric Co.), 91 B.R. 782, 784–85 (N.D. Ohio 1988).

A vast majority of courts agree that "new value" for purposes of § 547 must be something of tangible economic value. *See* Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (Matter of Fuel Oil Supply & Terminaling, Inc.), 837 F.2d 224, 229–31 (5th Cir. 1988); In re Hatfield Electric Co., 91 B.R. at 786; Fredman v. Milchem, Inc. (In re Nucorp Energy, Inc.), 80 B.R. 517, 519 (Bankr. S.D. Cal.1987), *aff'd*, 902 F.2d 729 (9th Cir. 1990) ("the inquiry is whether the estate received something with economic value"); *see also* Charisma Investment Co. v. Airport Systems, Inc. (In re Jet Florida System, Inc.), 841 F.2d 1082, 1084 (11th Cir.1988) (consideration fitting the definition of "new value" requires receipt by the debtor of a material benefit).

In re Aero-Fastener, Inc., 177 B.R. at 137.

## IV. DISCUSSION

A. <u>Summary Judgment Standard</u>

According to the United States Bankruptcy Appellate Panel of the First Circuit in

<u>Raso v. Fahey (In re Fahey)</u>, 482 B.R. 678 (B.A.P. 1st Cir. 2012),

> "In bankruptcy, summary judgment is governed in the first instance by
> Bankruptcy Rule 7056." <u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d 760,
> 762 (1st Cir. 1994); *see also* <u>Soto–Rios v. Banco Popular de Puerto Rico</u>, 662
> F.3d 112, 115 (1st Cir. 2011). "By its express terms, the rule incorporates into
> bankruptcy practice the standards of Rule 56 of the Federal Rules of Civil
> Procedure." <u>In re Varrasso</u>, 37 F.3d at 762 (citations omitted); *see also* <u>Soto–
> Rios v. Banco Popular de Puerto Rico</u>, 662 F.3d at 115; Fed. R. Bankr. P. 7056;
> Fed. R. Civ. P. 56.6 "It is apodictic that summary judgment should be
> bestowed only when no genuine issue of material fact exists and the movant
> has successfully demonstrated an entitlement to judgment as a matter of
> law." <u>In re Varrasso</u>, 37 F.3d at 763 (citing Fed. R. Civ. P. 56(c)). "As to issues
> on which the nonmovant has the burden of proof, the movant need do no
> more than aver an absence of evidence to support the nonmoving party's
> case." Id. at 763, n.1 (citation and internal quotations omitted). "The burden
> of production then shifts to the nonmovant, who, to avoid summary
> judgment, must establish the existence of at least one question of fact that
> is both genuine and material." <u>Id.</u> (citations and internal quotations
> omitted). The "mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no genuine issue of
> material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48, 106
> S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

<u>In re Fahey</u>, 482 B.R. at 686–87. *See also* <u>In re Spenlinhauer</u>, 572 B.R. 18, 32–33 (Bankr. D.

Mass. 2017).

B. <u>Applicable Law under § 547(c)(4)</u>

"Payments by a debtor to a creditor 'for or on account of an antecedent debt' made

during the ninety days immediately preceding the filing of a bankruptcy petition are

preferential transfers or 'preferences'" that the trustee can avoid if the debtor was

insolvent and if the payment enabled the creditor to receive more than such creditor would receive if the case were a case under Chapter 7, the payment had not been made, and the creditor was able to receive payment of such debt to the extent provided by title 11. *See* 11 U.S.C. § 547(b). *See also* <u>Bogdanov v. Avnet, Inc.</u>, 2011 WL 4625698, at *2 (quoting 11 U.S.C. § 547(b)).  Defenses to preferential transfer actions are designed "to rescue from attack in bankruptcy those kinds of transactions, otherwise fitting the definition of a preference, that are essential to commercial reality and do not offend the purposes of preference law, or that benefit the ongoing business by helping to keep the potential bankrupt afloat." <u>Wiscovitch-Rentas v. PDCM Assocs. (In re PMC Mktg. Corp.)</u>, 518 B.R. 150, 157 (B.A.P. 1st Cir. 2014) (citing <u>Official Comm. of Unsecured Creditors of Maxwell Newspapers, Inc. v. Travelers Indem. Co. (In re Maxwell Newspapers, Inc.)</u>, 192 B.R. 633, 635 (Bankr. S.D.N.Y. 1996)).

 "The subsequent new value defense has two interrelated purposes, first, "to encourage trade creditors to continue dealing with troubled businesses, and second  . . . to treat fairly a creditor who has replenished the estate after having received a preference." <u>Id.</u> (citations omitted).  The Bankruptcy Code defines the term "new value" as follows:

> [M]oney or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

11 U.S.C. § 547(a)(2).  *See also* <u>In re Aero-Fastener, Inc.</u>, 177 B.R. at 137-38.  To succeed in a § 547(c)(4) defense, a creditor must prove three elements:  1) that "new value was

extended after the preferential payment sought to be avoided;" 2) that "the new value is not secured with an otherwise unavoidable security interest . . ."; and 3) that "on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]" *See* In re PMC Mktg. Corp., 518 B.R. at 157–58.

According to the United States Bankruptcy Appellate Panel for the First Circuit, "Whether something is new value presents a question . . . of fact." Id. at 157 (citing Bogdanov v. Avnet, Inc., 2011 WL 4625698, at *10 (internal quotations and citation omitted). "[T]he determination of new value is still based upon the premise that an augmentation or material benefit to the debtor's estate has occurred that offsets the reduction in the estate caused by the preferential transfer." Moser v. Bank of Tyler (In re Loggins), 513 B.R. 682, 713 (Bankr. E.D. Tex. 2014) (internal quotations and citations omitted). Moreover, "'the creditor is entitled to a dollar-for-dollar offset.'" 518 B.R. at 157-58 (citing Wheeling Nat'l Bank v. Meredith (In re Meredith Manor, Inc.), 103 B.R. 118, 120 (S.D.W.Va.1989), *aff'd*, 902 F.2d 257 (4th Cir. 1990)). Finally, property that is transferred is valued at the time of the transfer. Saracheck v. Crown Heights House of Glatt, Inc. (In re Agriprocessors, Inc.), 521 B.R. 292, 317 (Bankr. N.D. Iowa 2014) (citing Gonzales v. Nabisco Div. of Kraft Foods, Inc. (In re Furr's Supermarkets, Inc.), 317 B.R. 423, 430–31 (B.A.P. 10th Cir. 2004)).

C. Analysis of the § 547(c)(4) Defense

For purposes of this decision, the Court assumes that the Plaintiff has sustained his burden under 11 U.S.C. § 547(b). *See* 11 U.S.C. § 547(f) and (g). Section 547(c)(4) provides:

(c) The trustee may not avoid under this section a transfer— . . .

> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
>> (A) not secured by an otherwise unavoidable security interest; and
>> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4).

The dispute between the parties revolves around the measure of new value delivered by GRRC to the Debtor.   The Court concludes that there is no dispute of material fact that GRRC delivered 105 Race Blocks to the Debtor after the April 22, 2016 payments; that the Race Blocks were not secured by an otherwise unavoidable security interest; and that the Debtor did not make an otherwise avoidable transfer to, or for the benefit of GRRC.

In re Agriprocessors, Inc., 521 B.R. at 317,  the bankruptcy court considered a trustee's argument that mirrors the arguments made by the Plaintiff  in this case, namely "that the 'new value' given can and should be negated by events that happen *after* the Defendant made the transfer of that new value. Trustee relies on events occurring *after* Debtor received the new value as negating any 'replenishment' of the estate." Id. (emphasis in original).  The Iowa bankruptcy court rejected the trustee's argument as contrary to applicable case law. Id. It stated:

> The Tenth Circuit Bankruptcy Appellate Panel rejected an analogous argument in Gonzales v. Nabisco Div. of Kraft Foods, Inc. (In re Furr's Supermarkets, Inc.), 317 B.R. 423, 430–31 (10th Cir. BAP 2004).   There,

trustee argued that perishable goods transferred by a creditor and claimed
to be "new value" under § 547(c)(4) were ultimately returned — and thus the
returned goods "never served to replenish the estate for purposes of §
547(c)(4)." Id. The Tenth Circuit BAP concluded:

> Put another way, the Trustee takes the position that, due to its
> ultimate return, the Returned Product provided no value to
> the estate at the time it was delivered to Furr's. The argument
> ignores the rulings of the United States Court of Appeals for
> the Tenth Circuit as well as the Tenth Circuit Bankruptcy
> Appellate Panel that state that property that is transferred is
> *valued at the time of the transfer*. At the time of its delivery to
> Furr's, the Returned Product had a value of $90,180.74.
> Therefore, the pre-petition estate of Furr's was increased (or,
> for our purposes, "replenished") by an amount equal to the
> value of the Returned Product at the time of its delivery. The
> fact that the Returned Product was returned to Nabisco after
> it lost its value does not change this fact, and is not relevant
> to the "new value" analysis.

Id. (emphasis added). The BAP further amplified this rationale in a
footnote:

> The weakness of the Trustee's logic becomes clear when one
> considers the following hypothetical. Assume that goods are
> delivered from a buyer to a seller with no right of return with
> a value of $90,180.74 upon their delivery. After receipt by the
> buyer, for whatever reason, the goods lose their value. As a
> result of the loss of value, the buyer is unable to obtain any
> economic benefit from the purchase of the goods. Let us
> further assume that the buyer files bankruptcy and claims
> that the seller is the recipient of a preferential payment made
> before the goods were delivered. *Under the Trustee's reasoning,
> the seller would not be entitled to consider the supplying of these
> goods as the supplying of "new value," since the buyer/debtor was
> unable to ultimately generate any economic benefit from the goods.
> "New value" would be found only when the debtor was able to turn
> the delivered goods into revenue. Section 547(c)(4) contains no such
> requirement.*

Id. at n. 27 (emphasis added).

In re Agriprocessors, Inc., 521 B.R. at 317–18.

The requirement that new value replenish the estate must be determined at the time the new value is delivered to the Debtor.  Were new value to be determined at a later time using a liquidation value, the fundamental purpose of the exception, which is to discourage creditors from dismembering a debtor that is sliding into bankruptcy and to encourage creditors to supply and work with troubled businesses, would be eviscerated. As GRRC recognizes, "no creditor with any commonsense (or half-decent counsel) would continue delivering to a debtor upon the slightest whiff of financial trouble."  It supports its argument by observing that creditors would have no certainty about the postpetition value of their goods for purposes of the defense, adding that the liquidation value often will be less than the prepetition value particularly in Chapter 7 cases.  Accordingly, GRRC properly rejects any notion that cancellation of the race or its cessation of deliveries following cancellation of the race, has any bearing on the the new value defense it asserts. Additionally, it correctly contends the new value should be determined with reference to its proposal and purchase order pricing, relying upon In re Furr's Supermarkets, Inc., 317 B.R. at 430–31, and Bogdanov v. Avnet, Inc., 2011 WL 4625698, at *11.[9]  As the Court

---

[9] The court in Avnet, Inc. stated:

> The Trustee urges the court to look beyond the actual value of the goods shipped and determine if the estate—on balance, after considering all of the circumstances—was "benefitted." But that approach seems unwarranted, at least in this case. The goods advanced on credit by Avnet benefitted the estate in the ordinary sense that "money's worth" was provided to the estate. There is no apparent reason to read more into the statutory language beyond the requirement that new value be comprised of money or money's worth in goods, services, or new credit. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 177, 372 (1977) ("new value" is to be "defined in [its] ordinary sense[ . . . ]"). The bankruptcy court found that the actual value of the goods

observed in <u>In re Furr's Supermarkets, Inc.</u>, "Under the Trustee's reasoning, the seller would not be entitled to consider the supplying of these goods as the supplying of 'new value,' since the buyer/debtor was unable to ultimately generate any economic benefit from the goods. 'New value' would be found only when the debtor was able to turn the delivered goods into revenue. Section 547(c)(4) contains no such requirement."  317 B.R. at 431, n.27.  The Court is persuaded by that reasoning and concludes that the decision relied upon by the Plaintiff, namely <u>In re Globe Bldg. Materials, Inc.</u>, 325 B.R. at 262-63, is readily distinguishable because it involved one contract for the purchase of one machine.

D. <u>The § 547(c)(2) Defense</u>

In view of the discrepancy in the evidence regarding application of Check No. 1051 to Invoice No. 56246 in the amount of $136,928.63 or to Invoice No. 56343 in the amount of $128,326.63, the Court concludes that a genuine issue of material fact exists that precludes entry of summary judgment.

---

shipped was established by the amount invoiced. . . . Accordingly, the bankruptcy court's factual determination that $7 million worth of goods shipped to Amherst or its customers constituted new value is supported by the evidence of record, is not clearly erroneous, and is affirmed. The bankruptcy court's construction of the statutory term "new value" was correct.

<u>Bogdanov v. Avnet, Inc.</u>, 2011 WL 4625698, at *11.

**IV. CONCLUSION**

In view of the foregoing, the Court grants GRRC's Motion for Partial Summary Judgment in part and denies it in part.  The Court shall enter partial summary judgment in favor of GRRC with respect to its new value defense under 11 U.S.C. § 547(c)(4) in the amount of $99,330.00.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  August 21, 2018