# UNITED STATES BANKRUPTCY COURT
# FOR THE
# DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**BOSTON GRAND PRIX, LLC,**                        Chapter 11
    Debtor                                    Case No. 16-12574-MSH

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**GARY W. CRUICKSHANK, Chapter 7 Trustee,**
    Plaintiff
v.                                               Adv. P. No. 17-1115-JNF
**GEORGE R. ROBERTS COMPANY,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Complaint filed Gary W. Cruickshank, the

Chapter 7 Trustee (the "Plaintiff" or the "Trustee") of Boston Grand Prix, LLC (the

"Debtor" or "BGP"), against the Defendant, George R. Roberts Company (the

"Defendant," "GRRC," or "Roberts"), to avoid two allegedly preferential transfers made

by checks payable to GRRC in the total amount of $278,326.63.  Specifically, the Trustee

commenced this Adversary Proceeding against GRRC by filing the Complaint on

September 13, 2017 seeking to avoid and recover two allegedly preferential transfers

made by the Debtor to GRRC in the amounts of $128,326.63 (Check No. 1051) and

$150,000.00 (Check No. 1042), pursuant to 11 U.S.C. §§ 547, 550, and 551.  GRRC filed its

Answer to the Complaint on October 10, 2017.  On May 18, 2018, GRRC moved for partial summary judgment with respect to two defenses it raised in its Answer to the Plaintiff's Complaint.  On August 21, 2018, the Court granted in part and denied in part the Defendant's Motion for Partial Summary Judgment, granting judgment to GRRC on its new value defense under 11 U.S.C. § 547(c)(4) in the amount of $99,330.00, and denying summary judgment with respect to its ordinary course defense under 11 U.S.C. § 547(c)(2) due to "the discrepancy in the evidence regarding application of Check No. 1051 to Invoice No. 56246 in the amount of $136,928.63 or to Invoice No. 56343 in the amount of $128,326.63." *See* Cruickshank v. George R. Roberts Co. (In re Boston Grand Prix, LLC), No. 16-12574-MSH, 2018 WL 4030731, at *11 (Bankr. D. Mass. Aug. 21, 2018).

Following the Court's August 21, 2018 decision, the parties filed their Joint Pretrial Statement, and the Court scheduled a trial.  In addition to the triable issue of GRRC's ordinary course of business defense under 11 U.S.C. § 547(c)(2) pertaining to Check No. 1051 and Check No. 1042, GRRC asserted an affirmative defense under § 547(c)(1), seeking to reduce its preference exposure by $73,632.00 as a contemporaneous exchange for new value, and, in addition, it asserted a defense under § 547(c)(4) seeking to reduce its exposure owing to subsequent new value by another $10,384.00, in addition to the subsequent new value of $99,330.00 which this Court determined GRRC advanced in its August 21, 2018 decision.

The Court conducted the trial on January 28, 2019 and January 29, 2019 at which four witnesses testified and over 49 exhibits were introduced into evidence, as well as 69 exhibits proffered by the Plaintiff that were relied upon by his expert witness.  The Court

2

now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. UNDISPUTED FACTS

The Court paraphrases the undisputed facts set forth in the Joint Pretrial Statement. The Debtor commenced this case by the filing of a voluntary Chapter 7 petition on July 5, 2016 (the "Petition Date"). The Chapter 7 Trustee was appointed on July 6, 2016.

GRRC is a Maine corporation with a principal place of business at 192 Biddeford Road, Alfred, Maine 04002. GRRC manufactures precast and custom concrete products for residential and commercial customers. Stephen Ray ("Ray") is its president and oversees its day-to-day business operations, which in 2015 and 2016 included its business relationship with the Debtor.

On or about May 18, 2015, BGP entered into an agreement captioned *IndyCar® Series 2016-2020 Event Agreement-Street Corner* with IndyCar, LLC. On or about May 14, 2015, BGP entered into an *Agreement for the Conduct of Professional Automobile Racing in Downtown Boston* with the City of Boston. In connection with its agreements with IndyCar, LLC and the City of Boston, the Debtor purchased concrete barriers from GRRC. The Debtor intended the barriers to be used for its construction of the Boston Grand Prix race track.

Pursuant to a Proposal and Purchase Order, the Debtor agreed to purchase, and GRRC agreed to manufacture and deliver, three types of custom-made barriers in the following quantities: 2,200 straight barriers; 100 radius barriers; and 110 pit barriers, and

3

the Debtor agreed to pay to GRRC $944.00 for each straight barrier; $979.00 for each radius barrier; and $675.00 for each pit barrier.

GRRC received Check No. 1005 from BGP in the mail on March 23, 2016, in the amount of $44,144.00. GRRC applied Check No. 1005 to Invoice No. 56213, dated March 7, 2016. Invoice No. 56213 was in the same amount as the check. Check No. 1005 was not paid within 90 days of the Petition Date.

GRRC received Check No. 1025 from BGP in the mail on April 2, 2016, in the amount of $133,399.00. GRRC applied Check No. 1025 to Invoice No. 56267, dated March 28, 2016. Invoice No. 56267 was in the same amount as the check. Check No. 1025 was not paid within 90 days of the Petition Date.

GRRC received Check No. 1051, dated April 20, 2016, in the mail on April 22, 2016. GRRC deposited Check No. 1051 into its bank account that same day. Check No. 1051 in the amount of $128,326.63 cleared the Debtor's bank account on April 25, 2016.

GRRC picked up Check No. 1042, dated April 21, 2016, from BGP's office in Boston, Massachusetts on April 22, 2016 and it deposited it into its bank account that same day. Check No. 1042 in the amount of $150,000.00 cleared the Debtor's bank account on April 25, 2016.

Check No. 1051 and Check No. 1042 were issued by the Debtor on or within 90 days of the Petition Date. GRRC applied Check No. 1042 in the amount of $150,000.00 to Invoice Nos. 56138, 56148, 56157, 56174 and 56197.

GRRC held claims against BGP at the time that it received Check Nos. 1042 and 1051. GRRC held claims against BGP at the time that Check Nos. 1042 and 1051 cleared

BGP's bank account.  In addition, Check Nos. 1042 and 1051 were made payable to GRRC

and were paid to or for the benefit of GRRC.

The payments can be summarized as follows:

| Check No. | Invoice Date | Received | Clear Date | Amount | Days: Invoice To Receipt |
|---|---|---|---|---|---|
| 1005 | 03/07/16 | 3/23/16 | 3/24/16 | $48,144.00[1] | 16 |
| 1025 | 3/28/16 | 4/2/16 | 4/05/16 | $133,399.00[2] | 5 |
| 1051 | 4/13/16 | 4/22/16 | 4/25/16 | $128,326.63[3] | 9 |
| 1042 | 1/29-2/26/16 | 4/22/16 | 4/25/16 | $150,000.00 | 56-84 |

GRRC issued the following fourteen (14) invoices to BGP:

| Invoice # | Invoice Date | Invoice Amount |
|---|---|---|
| 56138 | 1/29/2016 | $28,084.00 |
| 56148 | 2/5/2016 | $42,126.00 |
| 56157 | 2/12/2016 | $34,102.00 |
| 56174 | 2/22/2016 | $14,042.00 |
| 56197 | 2/26/2016 | $78,234.00 |
| 56213 | 3/7/2016 | $48,144.00 |
| 56231 | 3/14/2016 | $80,240.00 |
| 56246 | 3/19/2016 | $136,928.63 |
| 56267 | 3/28/2016 | $133,399.00 |
| 56290 | 3/31/2016 | $108,275.13 |
| 56343 | 4/13/2016 | $128,326.63 |
| 56383 | 4/18/2016 | $109,046.50 |
| 56434 | 4/25/2016 | $108,324.00 |
| 56495 | 4/30/2016 | $56,168.00 |

---

[1] This amount corresponds to the amount of Invoice No. 56213.

[2] This amount corresponds to the amount of Invoice No. 56267.

[3] This amount corresponds to the amount of Invoice No. 56343.  The Trustee contends that Check No. 1051 was applied to Invoice No. 56246 in the amount of $136,928.63, leaving a balance of $8,602.00.  In that event, the Invoice Date to Check Delivery Date was 34 days.

The barriers delivered by GRRC were not secured by an otherwise avoidable security interest. The Debtor did not make any otherwise unavoidable transfers to or for the benefit of GRRC on account of any delivered barriers. The Debtor's bank account balances on April 22, 2016 for all three of its accounts totaled at least $1,303,048.87. BGP cancelled the Boston Grand Prix race on April 29, 2016.

## III. FACTS ADDUCED AT TRIAL

### A. The Trustee

The Trustee testified that he employed professionals to assist him in performing his duties as trustee, including collecting and reducing to money property of the bankruptcy estate and commencing actions to avoid preferential and fraudulent transfers. He stated that as a result of his efforts to date, he is holding approximately $566,000.00. As part of his duties, the Trustee testified that he has reviewed and continues to review the claims register, noting that the total of unsecured claims is approximately $9 million and that none of them are objectionable, except one filed by "IndyCar." With respect to administrative expenses, the Trustee testified that, to date, those expenses will exceed $600,000.00 and that the Massachusetts Department of Revenue holds a priority claim of $3,115.00. With those figures in mind, the Trustee stated "the maximum dividend I would see with no administrative expenses would be slightly less than nine percent." He added: "If the administrative expenses are allowed in amounts as discussed, it's two to three percent."

B.  Stephen J. Ray

Ray, the president of GRRC since 2015, testified about his thirty years of experience in the precast cement business and as an employee of GRRC.  Having served as an outside sales representative, dispatcher, estimator, and vice-president of operations, he was very familiar with the business operations of GRRC.  As president, he testified that he was in charge of "the financial well-being of the company, the sales and estimating, project management and plant . . . production, as well as a division called "The Step Guys."  He stated that the controller, the plant manager, three project managers, and a general manager reported to him.

Ray testified that, in September of 2015, he communicated with an individual by the name of Tony Cotman ("Cotman") at a company identified as NZR Consulting ("NZR") about bidding on special race barriers.  According to Ray, BGP had engaged NZR to acquire all the items necessary to be able to construct the race course.  Based upon conversations and meetings with Cotman and others, GRRC prepared a quote for manufacturing the concrete barriers needed by BGP.  According to Ray, the task required reaching out to suppliers and developing systems and procedures for manufacturing and reinforcing the concrete race barriers because GRRC had never produced that specific type of product.  Although it produced jersey barriers, the ones required by BGP were larger and heavier than jersey barriers.

On or around November 20, 2015, NZR accepted GRRC's proposal.  On November 30, 2015, Ray emailed Cotman and Brian Hughes ("Hughes") at NZR, stating:  "We are working hard to get the submittal package together for you and we are getting very close

7

to ordering over a $100,000 worth of items. I would appreciate receiving a contract from you (or the Grand Prix Of [sic] Boston) or simply a signed copy of our final quote before I commit sending PO's out for that amount of money."[4]   Ray testified that the dollar value of the project to GRRC was approximately $2.2 million and that it was "by far the largest project" it had ever undertaken.   Because of the size of the project, Ray testified that "it was really important that our terms of the agreement were net 30 days," particularly in view of the "significant cash outlay up front."

Shortly after the email exchanges, GRRC received a purchase order from BGP signed by John Casey ("Casey"), as chief financial officer. The Purchase Order referenced the two-page quote submitted by Adam Foster on behalf of GRRC to BGP.  As noted above, BGP agreed to pay $944.00 for each standard precast concrete barrier (2,200 sections); $979.00 for each "'Curved' R-25" or radius barrier (100 sections), and $675.00 for each pit barrier (100 sections).  According to Ray, the manufacturing of the different types of barriers required different forms.

Ray testified that the payment terms which BGP accepted were "Net 30 days (with credit approval)" or "within 30 days of the date of the invoice."[5] Ray stated that, although

---

[4] These items referenced by Ray, included "anchor bolts, some L-shaped anchor bolts, galvanized." He added:  "There were eight that were required per barrier.  There were special cables that were to be cast in the ends of each barrier, six in each barrier. There was reinforcing cages . . .  that we ended up purchasing as opposed to making ourselves. There was three-inch diameter PVC pipe that had to be cast, one piece into each barrier, as well as the forms themselves."

[5] Ray elaborated:

BGP was a new company, he made every effort to ascertain its credit worthiness so GRRC could meet its obligations to its employees and vendors, a task hampered because BGP was a new entity.[6]  Moreover, he testified that GRRC incurred substantial costs including production costs ($13,000.00 to $14,000.00 per day) and delivery costs (approximately $600.00 per delivery).   The costs absorbed by GRRC to perform the contract put a substantial strain on its cash flow, particularly as it was drawing on a line of credit.

After acquiring the forms and items such as the galvanized anchor bolts, GRRC began manufacturing the race blocks in January of 2016 as all the blocks had to be delivered a week before Labor Day as the race was scheduled for the Labor Day weekend. Indeed, it began making rolling deliveries of the blocks, which weighed approximately 9,400 pounds, in January of 2016 to a Massport site in Boston, Massachusetts.

Ray testified that GRRC kept daily delivery logs, as well as so-called "pick tickets" printed from sale orders that would be entered into the company's computer system. According to Ray,

> Pick tickets would then be put together, along with a load check sheet that would then be provided, given to the driver. We have a driver's board. It would be -- the two sheets would be hung up there and so the driver would

---

[W]e had the meeting at my office with Mr. Hughes and Mr. Perrone [a former officer of BGP] in our proposal, as we -- the quote that you're looking at here in this exhibit. When we presented him with that, I highlighted the net 30 days on that and told him that that was going to be very important because we were a small company and in order to be able to continue operations, production and delivery, we would need to get paid in a timely fashion.

[6] Ray did not perform any credit checking with respect to the credit worthiness of Casey or his predecessor, Mark J. Perrone ("Perrone"), although he confirmed Perrone's experience organizing grand prix races.

9

be able to take those, go out and load his truck or have his truckload, as the case may be, and then that check sheet would be used. After he was loaded, he would come back to the office and the dispatcher or myself or kind of any -- anybody in the office that had been trained would go out and check the load to make sure they had everything on it they were supposed to have on.

Ray explained that the pick tickets were "basically a vehicle by which we can let the driver know what they are to load on their truck and deliver," while the check sheet was designed to make sure that the driver did not make a mistake and load an incorrect product when leaving the yard.

It was GRRC's regular business practice to maintain the delivery logs and pick tickets. Because the BGP project was so large, GRRC produced a spread sheet to track deliveries based on the quantity of each type of block to be delivered, as well as the name of the driver and the date of the delivery. Specifically, the spread sheet contained the date of deliveries, the number of straight, radius, and pit blocks shipped, the number of blocks left to ship per type of block, and the identity of the driver or "Casco" which was a contractor engaged by GRRC to make deliveries for GRRC to Boston. Indeed, the drivers sometimes made two trips in one day. Thus, by way of example, on March 18, 2016, GRRC made 8 separate trips from Alfred, Maine to Boston and delivered 42 straight race blocks; on April 20, 2016, it made five separate trips from Alfred, Maine to Boston and delivered 26 straight barriers; on April 21, 2016 it made five separate trips and

delivered another 26 straight barriers; and on April 22, it again made five separate trips and delivered another 26 straight barriers.[7]

Explaining how GRRC could deliver so many race blocks in a day, Ray testified about how drivers made two trips per day.  In instances of multiple trips, the drivers would leave Maine early in the morning around 4:30 a.m.  After delivering the race blocks to BGP's lot, they would leave Boston around 6:30 or 7:00 a.m., return to GRRC premises in Maine, reload, and then make a second delivery leaving Maine around noon so as to arrive in Boston around 2:00 to 2:30 p.m.  Thus, on April 22, 2016, there were two afternoon deliveries of 11 straight race blocks to BGP.  In this regard, BGP never made any requests regarding the timing or quantity of deliveries.

Ray also testified that, because GRRC was making so many deliveries to BGP each week commencing in March 2016, he reached out to NZR suggesting that GRRC bill BGP once per week.  He stated:  "what we decided to do was to bill on Mondays or the first day after for . . .  the blocks delivered the previous week. I think there was one exception in there. It was the day my controller was out, so we . . . actually billed for a Monday following that previous week. . . ."  Ray testified that he approved "every single invoice" that was submitted to BGP and other GRRC customers.

---

[7] The invoice amount for the April deliveries of 78 straight barriers would have been $73,632.00 (78 x $944.00).  Between April 25, 2016, and April 29, 2016, GRRC delivered 105 race blocks to the Debtor with a value of $99,330.00.  As noted above, this Court entered partial summary judgment in favor of GRRC with respect to its new value defense under 11 U.S.C. § 547(c)(4) in the amount of $99,330.00.  *See* In re Boston Grand Prix, LLC, 2018 WL 4030731, at *11.

Ray explained how invoices were created noting that the "Ship Date" on the invoice did not reflect the actual dates that blocks were delivered, although the supporting documents attached to the invoice, namely pick tickets and inspection forms, reflected the delivery dates and the 30-day invoice term.  Ray testified that it received a total of four payments from BGP.

Ray testified that he had communications with BGP prior to receiving a first payment from BGP on March 23, 2016.   Indeed, Ray testified that he traveled to Boston on March 17, 2016 to meet with Casey and to "request payment and . . .  [the] . . . need . . . [for] . . . prompt payments, remind him of the net 30 terms, both on our invoices and on the quote that we provided and requested that he get a check out to us, and this is the check that we received after that conversation."  Ray also indicated that he called and emailed Casey about payments usually either prior to or as a follow-up to an email.

On March 18, 2016, Ray left a voicemail for Casey and also emailed him, stating the following:

> It was a pleasure to meet you yesterday! The Grand Prix of Boston really seems to be picking [up] steam and promises to be a great event! We are proud to be a partner in this tremendous production. Per our conversation yesterday, we are a small company and have really put ourselves out there to get the production going so that we could be assured that we are going to have all the blocks needed made in time for the race. The cash we have invested into the forms and products made so far, have really put a tight clamp on our cash flow. I waited to send this email until our mail was delivered today. We did not get the check today that you sent in the mail. *So for now there are three invoices that are over 30 days old: Invoice #56138 for $28,084, Invoice #56148 for $42,126 and Invoice #56157 for $34,102. There is another invoice (#56174 for $14,042.00) that will be 30 days old this coming week.* Please confirm as soon as you can the amount of the check that was cut and mailed and let me know when we can expect the next payment. Thank you!

(emphasis supplied).[8]

On March 23, 2016, GRRC received Check No. 1005, dated March 22, 2016, by FedEx from the Debtor in the amount of $48,144.00. Ray emailed Casey to let him know that GRRC had received the check and that older invoices, totaling $198,588, remained unpaid, as well as to request additional payments. GRRC applied Check No. 1005 to Invoice No. 56213, dated March 7, 2016, which related to the delivery of 48 straight blocks. Check No. 1005 was the first payment GRRC received from BGP.

Ray testified that after emailing Casey on March 23, 2016 he called him and left a message requesting payment. Shortly thereafter, GRRC received by mail, on April 2, 2016, Check No. 1025, dated March 31, 2016, from BGP in the amount of $133,399.00 to which an invoice in that amount was attached.[9] Ray sent Casey an email asking Casey if BGP wanted GRRC to apply Check No. 1025 to the older outstanding invoices or to the invoice that was included with the payment, even though Invoice No. 56267 was not due. In an email to Casey dated April 4, 2016, Ray observed that "[a]s you can see, the amount we received would pay the (4) oldest invoices completely and partially pay Invoice #56197 dated 2/26/16." The Statement attached to the email reflected the following:

---

[8] The length of time between the invoice date and the check delivery date was 16 days; the length of time between the invoice date and the date the check cleared was 17 days. At the time GRRC applied this payment to invoice number 56213, there were five older invoices outstanding totaling $196,588.00 (56138, 56148, 56157, 56147 [sic], and 56197).

[9] GRRC applied Check No. 1025 to Invoice No. 56267, dated March 28, 2016, in the amount of $133,399.00.

13

| Date | Invoice # | Debits | Days Past Due | Credits | Balance |
|------|-----------|--------|---------------|---------|---------|
| 1/29/2016 | 56138 | 28,084.00 | 36 | | 28,084.00 |
| 2/5/2016 | 56148 | 42,146.00 | 29 | | 42,126.00 |
| 2/12/2016 | 56157 | 34,102.00 | 22 | | 34,102.00 |
| 2/22/2016 | 56174 | 14,042.00 | 12 | | 14,042.00 |
| 2/26/2016 | 56197 | 78,234.00 | 8 | | 78,234.00 |
| 3/14/2016 | 56231 | 80,240.00 | | | 80,240.00 |
| 3/19/2016 | 56246 | 136,928.63 | | | 136,928.63 |
| 3/28/2016 | 56267 | 133,399.00 | | | 133,399.00 |
| 3/31/2016 | 56290 | 108,275.13 | | | 108,275.13 |

At the time Ray caused that Statement to be prepared, there was a balance due on the BGP account of $655,430.76, excluding the payment of $133,399.00.

Ray sent another email to Casey on April 13, 2016 about the allocation of the payment and asking him when the next payment would be made.  Not hearing from Casey, GRRC applied the payment of $133,399.00 to Invoice No. 56267 in the same amount.[10]  In the meantime, GRRC's controller, on April 2, 2016, observed in an email to Ray: "Something hinky is going on."  Ray testified that GRRC was at peak production at the time, reiterating that it was incurring $13,000.00 to $14,000.00 per day in production costs and $3,000.00 to $4,000.00 in shipping costs.

On April 19, 2016, in an email to Hughes at NZR, Ray asked to be kept posted about a change in the delivery destination in Boston for the blocks and, knowing that his office was adjacent to Casey's office, added:  "I haven't heard from John.  There is now

---

[10] The date of Check No. 1025 was March 31, 2016.

$280,357.63 that is 30 old or older [sic].  We need some money soon.  Anything you can do is appreciated." One day later, on April 20, 2016, in an email to Hughes, Ray reiterated his concern, noting "Looks like payment isn't an issue unique to GRRC," and advised Hughes that he had left a message for Casey.  Ray testified that he wanted to let BGP know that GRRC would stop production or even discontinue shipments until it received payment.  Ray conveyed that position to Casey in an email dated April 20, 2016.  Indeed, he stated that he would drive to Boston to pick up a check and sit down with Casey or anyone on his staff "to work out a payment schedule."  Not hearing from Casey, Ray sent another email on April 21, 2016, urging Casey to address his April 20, 2016 email and respond.

Following Ray's emails, Casey eventually returned his calls, and Ray and Casey conversed on April 21, 2016.  Casey advised Ray that he had sent a check to GRRC in the approximate amount of $128,000.00.  In response, Ray indicated that he need another $150,000.00 to continue production.  Because Ray had planned to be in Boston on April 22, 2016 to assess a new lot to make sure trucks had appropriate access for deliveries, Ray told Casey to hold the check and he would pick it up.

Ray, in fact, picked up a check in the amount of $150,000.00 in the morning of April 22, 2016.[11]  GRRC also received Check No. 1051 in the amount of $128,326.63 in the mail on April 22, 2016.  According to Ray, that check arrived at GRRC's office at approximately 10:30 or 11:00 a.m.  Casey, on behalf of the Debtor, included Invoice No. 56343 in the

---

[11] GRRC made five deliveries on April 22, 2016.

amount of $128,326.63 in the package he sent containing Check No. 1051.  Thus, the amount of Check No. 1051 matched the amount of Invoice No. 56343, dated April 13, 2016, which was not yet due.  GRRC deposited the check on April 22, 2016 and applied the payment to that invoice.[12]

In an email to Casey, dated April 25, 2016, however, Ray told him that GRRC applied Check No. 1051 in the sum of $128,326.63 to invoice No. 56246 in the amount of $136,928.63, leaving a balance due of $8,602.00 and that it applied Check No. 1042 in the amount of $150,000 to the oldest five invoices as follows:

>Invoice # 56138 for $28,084.00     Paid Complete
>Invoice # 56148 for $42,126.00     Paid Complete
>Invoice # 56157 for $34,102.00     Paid Complete
>Invoice # 56174 for $14,042.00     Paid Complete
>Invoice #56197 for $78,234.00     Paid $31,464.00, leaving a balance of $46,588.00 – This invoice was due on March 27th

Ray testified that, with respect to Check No. 1051, it was applied to Invoice No. 56343 and that his representation to Casey was an error.  He explained: "I did that in error. My . . . controller actually posted it against a particular invoice that he sent."  GRRC's accounts receivable trial balance, dated December 6, 2016, shows that GRRC applied BGP's Check No. 1051 to Invoice No. 56343, dated April 13, 2016.[13]  Ray testified that information on the trial balance was inputted on the computer contemporaneously with the invoices by GRRC's controller.  The trial balance also showed that Check No. 1042 in the amount of

---

[12] Check No. 1051 cleared the Debtor's bank account on April 25, 2016.

[13] The Plaintiff contends that GRRC may have changed their postings after the race was canceled.

$150,000.00 was applied to the oldest outstanding invoices, leaving a balance on the fifth invoice of $46,588.00 (i.e., Invoice No. 56197 in the amount of $78,234.00).

According to Ray, on April 29, 2016, he received a telephone call from Hughes at NZR, and learned that the race had been canceled.  Ray then called Casey "regarding payment, as I had been doing throughout  . . . the project," leaving a message.  Ray eventually spoke with Casey who represented he would get back to Ray about a payment schedule the following week.

Ray testified that upon learning of the cancellation he spent time putting information together, trying to figure out how much was owed and contacting GRRC's corporate attorney and the owner of the company.  He also testified that he was unaware that a license was required from "IndyCar" to conduct the race until shortly before the race was canceled.

In a letter dated May 3, 2016 from Ray to Casey, Ray advised him that GRRC had "suspended all production activity of the race blocks, based on the news that the Race has been cancelled."  While noting that GRRC would resume production if an alternative site was found for the race, Ray summarized "where things stand in terms of invoicing, payment and production."  He listed "the dollars and invoices" owed to GRRC as follows:

| | |
|---|---|
| Over 30 days old and due now | $243,705.13 |
| Due on 5/13/16 – Invoice #56434 | $128,326.63 |
| Due on 5/18/16 – Invoice #56383 | $109,046.50 |
| Due on 5/25/15 – Invoice #56434 | $108,324.00 |
| Due on 5/30/16 – Invoice #56495 | $ 56,168.00 |

17

In addition, Ray made a notation on a copy of an Invoice No. 56434 transmitted to BGP as follows:

        Due Date:    5/13/2016
        Paid:        $0
        Due:         $128,326.63

Moreover, Ray made a notation on Invoice No. 56246, which was in the amount of $136,928.63 as follows:

        Due Date:        4/8/2016
        Paid:            $128,326.63
        Due:             $8,602.00

After April 22, 2016, GRRC did not receive any more checks from BGP. Ray was very concerned about payments and sent Casey an email just before midnight on April 29, 2016 noting that BGP owed it "a lot of money" and asking for the courtesy of a reply. Casey never responded.

C.  The Expert Witnesses

        1. Mark F. Stickney

Mark F. Stickney ("Stickney"), a principal in the firm of Spinglass Management Group, which provides, among other things, forensic accounting, financial advisory, and restructuring services, testified about the Debtor's solvency. Stickney prepared a balance sheet showing the Debtor was solvent on April 25, 2016. The balance sheet set forth total assets of $31,596,932.82 [sic], including cash (i.e., $1,245,737.00), "Sponsorship Receivable" (i.e., $7,151,950.00), Deposits (i.e., $487,500.00), Prepaid Expenses (i.e., $5,554,900.00), Fixed Assets (i.e., $1,297,471.00) and an Event License (i.e., $15,859,375.00). It also set forth total liabilities of $13,773,447.00 comprised of Accounts Payable (i.e.,

18

$3,029,190.00) and Deferred Revenue (i.e., $10,744,257.00).[14]  According to Stickney, in a footnote to the Balance Sheet (Schedule A to his Report), "the Value of the License to hold the event for 5 years was calculated based on the net present value of the budgeted cash flow," using a 50% discount rate "to account for the risk associated with the event."

Stickney did not perform a present value calculation to the annual cash flow before applying a discount. He stated: "all of those discounts are included in the 50%." Stickney admitted that he did not conduct any research to determine that the 50% rate was the appropriate rate, but testified that "the equity was still positive with a very low or zero net present value."

Stickney testified that he used the date of April 25, 2016 because that was the date the last payment cleared.  He also stated that he used projections because, as of April 25, 2016, the race had not been canceled.  He testified that the budget was based on "a business plan describing the opportunity, which included budgetary information that went out in a number of a months for this race."  He treated BGP as a going concern business because the race had not been canceled.  In other words, the cancellation of the race on April 29, 2016 did not affect his analysis.

Stickney also included in his report an exhibit of BGP's actual cash flow as of April 25, 2016, as well as its projected cash flow through September 2016 based upon the budget for the race.  Stickney testified that his projection of $8,150,210.00 in cash at the end of the

---

[14] Stickney stated that Deferred Revenue "represented the -- the cash that came in and the -- all the other transactions that -- that would not be recognized as revenue until -- until the race took place, until they were earned."

race affected his solvency analysis.  He admitted that "the cash flow assumes that -- that the race will move forward as outlined in the -- in the budgets that we received, with -- with the actual as of April that we compiled as the starting point."

Stickney testified that he examined QuickBooks prepared by the Trustee's accountant, as well as the Debtor's bank statements.  With respect to the category of "Sponsorship Receivable," he stated that it represented "sponsors that have been identified as -- as contributing that -- where the cash has not yet come in yet."

Stickney opined that the Debtor was solvent on April 25, 2016 based upon his balance sheet analysis.

On cross-examination, Stickney was unable to identify the person that prepared BGP's budget upon which he relied in forming his opinion and he did not know what the source documents were that were used in preparing the budget.  He also admitted that he did not compare the projections for 2016 against the other financial information that he received from the Trustee to test the projections against what he believed were actuals. He admitted that his main assumption was that the race would occur as planned. Stickney also admitted that if the race did not occur as planned BGP was insolvent.

BGP required intellectual property licenses from IndyCar under the *IndyCar® Series 2016-2020 Event Agreement* to conduct the race and it was required to pay a so-called sanction fee of $487,500.00.  In the IndyCar agreement, BGP was obligated to obtain a significant amount of insurance coverage.  Stickney admitted that the Debtor lacked the funds needed to pay for the insurance on April 25, 2016 and was in default under its agreement with IndyCar.

20

Stickney recognized that the Debtor was also required to obtain numerous and various permits and licenses from the City of Boston at an estimated cost of $4,235,878.00. He admitted that the Debtor was not in compliance with its contract with the City of Boston. Moreover, Stickney admitted that he was unaware that the City of Boston Conservation Commission had rejected BGP's application for a permit and he did not take into account the requirements that BGP post letters of credit. Nevertheless, he insisted that the absence of licenses and permits did not affect his opinion that the Debtor was solvent because the discount rate he applied accounted for "the overall risk." He elaborated:

> The discount rate incorporates risk of execution and budgetary misses and that type of thing and the start-up nature of it -- of the race. But fundamentally the race wasn't cancelled and if assets were written down every time there's a bunch of defaults, we'd be writing down assets in almost every case that I come across. That's influenced by -- I mean, in the IRS to take a deduction it has to be definitive. FASBE [sic] takes into account a lot of different factors, not just one or two defaults. And I personally have been in literally over hundreds of situations where there's a -- seas of defaults with secured creditors and threatening to -- with the vendors threatening to stop shipping and somehow the -- the company can get forbearance or extensions and navigate its way out of that.

Stickney did agree, however, that BGP would be insolvent if it could not conduct the race and that he did not analyze whether BGP had the ability to conduct the race.

### 2. Craig Jalbert

The Plaintiff's expert, Craig Jalbert ("Jalbert"), a Fellow in the American College of Bankruptcy, testified about his extensive background as a certified insolvency and restructuring advisor as well as about his memberships in numerous professional organizations. In his report, Jalbert listed 27 sources of information about BGP that he

reviewed to prepare his report, including newspaper stories appearing in the *Boston Globe*

and the *Boston Herald*, and information available on websites such as motorsport.com,

including 1) the *Indy CarSeries 2016-2012 Event Agreement;* 2) the Letter of Intent, dated

December 18, 2015, which the Debtor executed with the City of Boston, the Massachusetts

Department of Transportation, the Massachusetts Bay Transportation Authority, the

Massachusetts Convention Center Authority, and the Massachusetts Port Authority

regarding reports, plans, permits, and licenses; 3) the License Agreement between the

City of Boston and BGP requiring $4,235,878.00 for both a Force Account and a letter of

credit prior to the commencement of construction; 4) an April 12, 2016 Event License

Agreement executed by BGP and the Massachusetts Convention Center Authority, which

required a letter of credit in the sum of $5,280,00.00; 5) a Memorandum of Understanding,

dated April 13, 2016, between BGP and the Massachusetts Port Authority which required

a Force Account payment of $1,180,332.00 on May 1, 2016 and a  letter of credit in the sum

of $3,081,966.00; 6) a License Agreement, dated April 13, 2016, between the Massachusetts

Department of Transportation and the Massachusetts Bay Transportation Authority, on

the one hand and the Debtor on the other, which required a Force Account payment of

$650,172.00 and a letter of credit for estimated costs in the amount of $1,100,000.00; and

7) the denial of a permit from the City of Boston Conservation Commission, which

occurred no later than April 22, 2016.  According to Jalbert, the denial of the permit

"effectively blocked BGP from building parts of the race course because of new climate

change regulations and flood zones.  **Without this permit, the licenses could not be**

**issued and, therefore, the Indy Car race could not be run."** (emphasis in original).

Jalbert added that all of the agreements with the various City and state agencies had significant insurance requirements, that, in his experience, the underwriting process to obtain such insurance would have required extensive and lengthy efforts by both BGP and insurance companies, and that he was unaware of any such efforts having been made, and that "[t]here was no evidence that anything except the minimum insurance requirement were ever met."  Jalbert concluded:

> At no time in the process had BGP secured the necessary permits and licenses or an Event Title Sponsor.  Further, there is no evidence that BGP had the funds to pay the necessary fees and costs to obtain the required permits and licenses as required, therefore there were multiple material breaches of the Indy Car Agreements as of April 1, 2016.
>
> Additionally, local papers and reports were replete with negative information all indicating that the race was likely to never happen, particularly due to environmental and community concerns and activities.

. Based upon his extensive review of documents, Jalbert concluded that on April 22, 2016, the date on which GRRC received two checks form BGP (as opposed to April 25, 2016 the date the checks cleared),[15] "there was zero possibility that the race was going to be run over Labor Day weekend of 2016."  Jalbert testified that his opinion as to solvency would be the same regardless of the date. He emphasized that BGP lacked "the wherewithal to obtain the necessary licenses and permits to ever run the race."  Based upon his analysis, Jalbert opined that BGP was insolvent as of April 22, 2016 and remained grossly insolvent at all times through the date of the filing of the bankruptcy petition.  He testified:

> There were so many issues with this company, with its ability to obtain its
> -- the permits, to manage its cash, and there's more, I'm sure, if I had enough

---

[15] The Court concludes that for the purposes of Jalbert's analysis and opinion, the three day difference is immaterial.

time to think about it.  There's not one -- there's nothing anywhere that I saw that would lead me to believe that Boston Grand Prix could have turned that around.

He elaborated:

On March 1, Grand Prix -- Boston Grand Prix, LLC was to have an event title sponsor. It didn't have that. By some date prior to April 22, and I don't know the exact date, it was to have insurance in place. It was supposed to have all of the permits and licenses, including environmental, in place. Construction was supposed to begin May 1. Granted, there was a -- there was a request to delay that to May 5, a five-day delay. But to my knowledge, there's no contract anywhere for someone who's going to construct the race course.  . . .

    [O]n April 25, if we use Mr. Stickney's numbers, the company has total cash on hand of $1,245,737. Before May 1 the -- and before they could get the final permits issued, they had to get the environmental issue resolved, which on April 20, just two days prior, the Conservation Commission for the City of Boston -- I know they use different language, but effectively denied, at least temporarily, the environmental permit as of that date. They had two million dollars that they needed to pay for the force accounts with the various governmental authorities. The two million dollars was to be matched with another 13 or 14 million dollars' worth of bonds, which had to be in place on May 5 before the final -- could be final issues could be resolved.  Those two -- those -- the sum of those two numbers, roughly 15 million dollars is the cost that the city -- the Convention Center, Mass Port and the MBTA were to incur in just the first year of the race for which that 15 million dollars the budget has $200,000 for. So they were going to have to come up with all that -- all those monies by May 1, the insurance by May 1, the bonding in place by May 1. They hadn't had a title sponsor by April 22 or 25 or for that matter July 5th.

You -- we can go document by document, meeting by meeting. There's -- oh, they changed management. I don't know exact date. March or April of 2000 -- you know, sometime early on 2016. They went through -- the CEO left and they – and Mr. Casey was promoted from CFO to CEO. They never prepared a financial statement. They didn't file any payroll tax returns. They didn't even have anyone on payroll, even though they treated them as employees. I could go on and on and on with this -- this enterprise had

no chance of delivering this race on the weekend of Labor Day in 2016. And
I knew that on April 22.[16]

Jalbert observed that there was no balance sheet available from BGP so that he

chose to use Stickney's report as a starting point for his analysis, which he then adjusted

in a number of different ways and for a number of different reasons.  For example, Jalbert

adjusted the Sponsorship Receivables from $7,151,950.00 to ($5,438,400.00) as those

receivables should have been deferred because the funds were not earned until the race

occurred.  In addition, Jalbert eliminated a category of assets for Prepaid Expenses in the

sum of $5,554,900.00 because "they should be written off and charged to the profit and

loss as a negative because there was never going to be a benefit or never going to be a

revenue that would have offset them in the matching principle."

Although Stickney valued the Debtor's license at $15,859,375.00, Jalbert valued it

at zero, testifying that "[i]f the race is never going to run, then there is no event license."

Jalbert testified that he rejected Stickney's assumption that the race was going to run for

the next five years, noting that every year BGP would have to go through the licensing

and permitting processes.  Thus, based upon his adjustments, Jalbert concluded that the

total asset value for the Debtor was $4,652,690.00.

To determine liabilities, Jalbert testified that he examined all proofs of claim filed

in the Debtor's bankruptcy case as well as its schedules of liabilities to determine when

the liabilities arose and what they were as of April 22, 2016.  He concluded that the

---

[16] Jalbert defined as a prepayment method for certain anticipated City and State services.

accounts payable were $2,552,630.00, an amount $476,560.00 less than $3,029,190.00, the figure used by Stickney. Jalbert included as a liability advanced ticket sales of $2,025,082.00. According to Jalbert, the Debtor had raised that sum of money but it should have been considered deferred revenue and had to be recognized as a liability as of the date of the insolvency test. He also included as liabilities a sponsorship refund of $1,363,500.00 and an IndyCar sanction fee of $4,312,500.00 which was payable regardless of whether the race was run. He concluded that total liabilities were $10,453.761.00.

In sum, Jalbert, unlike Stickney, did not use a going concern balance sheet test to determine solvency. He stated that "in my opinion, this wasn't a going concern." He concluded BGP was insolvent by $5,801,071.00 on April 22, 2016 and "remained insolvent at all times until the filing date on July, 2016."

## IV. POSITIONS OF THE PARTIES

### A. Insolvency

#### 1. The Plaintiff

The Plaintiff contends that he established his prima facie case that the payments made by Check Nos. 1051 and 1042 on April 22, 2016 are voidable under 11 U.S.C. § 547(b)(1)-(5). Specifically, the Plaintiff asserts that the April 22, 2016 payments were paid from funds held in BGP's bank account and thus constituted transfers of property of the Debtor for purposes of subsection 547(b). In addition, the Plaintiff contends that the April 22, 2016 payments were made to GRRC, a creditor of the Debtor, as Check No. 1042 in the amount of $150,000.00 and Check No. 1051 in the amount of $128,326.63 paid debts incurred before April 22, 2016 and that those two payments were made on account of an

antecedent debt owed by the Debtor to GRRC before the April 22, 2016 payments were made.    Moreover, the Plaintiff asserts that, pursuant to 11 U.S.C. § 547(f), BGP was presumptively insolvent in the ninety days prior to the petition date, the payments were made within the 90 days prior to the petition date, which commenced on April 6, 2016 and ran through the petition date of July 5, 2016, and the payments enabled GRRC to receive more than it would have received if (i) the case were a case under Chapter 7; (ii) the April 22, 2016 payments had not been made, and (iii) GRRC received payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

The Trustee asserts that he established that even without considering payments for administrative claims, the distribution to unsecured creditors in this case will be less than 9% and that, if his estimates of administrative fees also are considered, the distribution will be significantly less in the range of 2-3%.  Citing Hoffinger Indus., Inc. v. Bunch (In re Hoffinger Indus., Inc.), 313 B.R. 812 (Bankr D. Ark. 2004), the Plaintiff states that the law is well settled that unless creditors would receive a 100% payout, "'any unsecured creditor who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation.'" Id. at 827 (citations omitted).

The Plaintiff also argues that GRRC failed to rebut the presumption of insolvency, arguing as follows:

> (i) Mr. Stickney applied a going-concern value to the Debtor based upon an untested and unsupported assumption that going-concern value was appropriate solely because the race had not yet been cancelled; (ii) Mr. Stickney's opinion relied principally upon a five year projection of unknown origin, about which he had no knowledge; (iii) Mr. Stickney

arbitrarily assigned a discount factor of fifty percent (50%) to an asset he created known as the "Event License," based on the unreasonable assumption that the race would go forward for five years and despite the fact that he knew nothing about the projection or any of the Debtor's actual financial obligations; and (iv) Mr. Stickney's balance sheet overstated assets and understated liabilities in a manner contrary to the accounting principles upon which he claimed to rely.

Putting aside the issue of solvency, the Plaintiff asserts that because he met his burden on all the elements of a preferential transfer at trial, the burden shifted to GRRC to prove its affirmative defenses by the preponderance of the evidence, namely its ordinary course defense under 11 U.S.C. § 547(c)(2), its contemporaneous exchange for new value defense under 11 U.S.C. § 547(c)(1), and its subsequent new value defense under 11 U.S.C. § 547(c)(4).

### 2. The Defendant

GRRC contends that the Debtor was solvent on April 25, 2016.  In support of its expert's going concern valuation and balance sheet, it noted that the Plaintiff submitted no testimonial or documentary evidence 1) regarding why BGP canceled the race on April 29, 2016; 2) regarding "the analysis in which BGP engaged or did not engage prior to cancelling the race on April 29, 2016;" 3) "whether BGP was going through any turbulence in its management prior to cancelling the race;" 4) that it breached "any agreement with IndyCar, the City of Boston, or any other public or private entity . . .;" 5) that IndyCar, the City of Boston, or any other public or private entity called a default under any agreement with BGP or took any other action to terminate any agreement with BGP concerning the race; 6) that BGP failed to obtain any necessary license or permit for conducting the race in 2016 "at any level or from any relevant governing body;" 7)

28

regarding "whether or not the Conservation Committee of the City of Boston issued any environmental permits to BGP on an interim or final basis, or whether or not such permits were required for the conducting of the Boston Grand Prix race;" 8) that BGP was "required to obtain any environmental permit at any time from the Conservation Committee of the City of Boston or any other entity to conduct the Boston Grand Prix race;"[17] 9) that BGP was unable to obtain any insurance coverage it desired or was required to obtain, if any, by any entity, or that the lack of insurance played any role in why the Boston Grand Prix race was cancelled; 10) "that BGP failed to satisfy any letter of credit or cash requirements by the City of Boston or by any other public or private entity at any time;" 11) "that BGP encountered any challenges in regard to designing, constructing, or obtaining permitting for its race track;" 12) "that BGP was required to post a bond in any amount in order to conduct the race on time," or "that BGP failed to post any bond that was required for the race;" 13) "that BGP was unable to meet any obligation (financial or otherwise) that it had under any contract, license, memorandum of understanding, or other agreement with the Massachusetts Convention Center Authority, the Massachusetts Port Authority, the Massachusetts Department of Transportation, or the Massachusetts Bay Transportation Authority," or "that BGP

---

[17] It noted that no meeting minutes or other records from the Conservation Committee were admitted at trial for the truth of the matters contained therein, including as to BGP or any other entity.

cancelled or intended to cancel the Boston Grand Prix race as the result of any obligation or default as to such entities at any time prior to April 29, 2016;" 14) "that BGP cancelled the race on April 29, 2016, because of any problems with its finances, permitting, licensing, environmental permitting, insurance, bonding, or any other issue or concern or problem;" 15) "that BGP, NRZ, or anyone else associated with BGP planned or intended to cancel the 2016 race at any time prior to its official cancellation on April 29, 2016, including as of April 25, 2016;" 16) "that BGP failed to secure any event hosting or sponsorship agreement or license, including an Event Title Sponsor, that may have been required under any agreement for conducting of the race in 2016;" 17) "that BGP did not fully expect to conduct the race on time as scheduled in 2016 and in the four years thereafter at any time prior to the official cancellation of the race on April 29, 2016, including as of April 25, 2016;" 18) "that BGP lacked sufficient funds, including cash or other capital, at any time to conduct the race as scheduled in 2016;" and 19) "that BGP was unable to pay any debt that became due before or after April 29, 2016."

GRRC contends that BGP was an operating business and there was no evidence that it was on its "deathbed," arguing the following:

> The only admissible evidence in the record regarding BGP's business operations established that BGP continued to operate its business as usual prior to the cancellation of the race on April 29, 2016, including as evidenced by: (i) Casey's call with Ray on April 29, 2016, in which Casey proposed a call with Ray the next week to discuss additional payments to GRRC; (ii) BGP delivered two checks to GRRC on April 22, 2016, for custom-made race barriers that, if not used by BGP, had a very limited resale value to BGP because of their unique specifications and use; (iii) BGP was considering leasing a new storage lot for anticipated future barrier deliveries from GRRC as late as April 19, 2016; and (iv) BGP continued to write tens of

thousands of dollars of checks in April 2016, including a $99,770 check to Massachusetts Convention Center Authority dated April 25, 2016.

In accordance with these arguments, GRRC contends that based upon Stickney's recreation of BGP's balance sheet and conclusion that BGP was an operating business, it established that BGP's licenses to conduct the race had a value of $15,859,375.00 at a 50 percent discount rate, that its assets exceed its liabilities even if a discount rate as high as 80 or 90 percent were applied rather than the 50 percent utilized by Stickney. In its view, it rebutted the presumption of insolvency and "Jalbert's opinion was not supported by the evidence at Trial." In other words, GRRC contends that the record is devoid of "any admissible facts on which the Court could conclude that there was a 0% chance of the race happening as planned or that BGP was anywhere near its deathbed as of April 25, 2016 (or at any other date prior to the official cancellation)."

B. The § 547(c) Defenses

1. The Defendant

With respect to its defenses under § 547(c), GRRC maintains it is entitled to judgment as follows:

> a) judgment for $10,384.00 in subsequent new value credit pursuant to § 547(c)(4);
> b) judgment for $73,632.00 in contemporaneous exchange new value credit pursuant to § 547(c)(1);
> c) judgment that Check No. 1051 in the amount of $128,326.63 is not avoidable in its entirety pursuant to § 547(c)(2); and
> d) judgment that Check No. 1042 in the amount of $150,000.00 is not avoidable in its entirety pursuant to § 547(c)(2).

Specifically, with respect to its § 547(c)(1) defense, GRRC seeks a credit of

$73,632.00 because it delivered 78 straight barriers contemporaneously with Check No.

1051 and 1042.  It argues as follows:

> Although BGP made payments to GRRC on March 23 and April 2, 2016, by
> April 20, 2016, BGP's debt to GRRC had grown once more as a result of
> GRRC's continued delivery of new barriers on a rolling basis. In response
> to communications from Ray on April 20 and 21, 2016, Casey called Ray on
> April 21, 2016, and promised to make two additional payments to GRRC,
> one of which Ray picked up on April 22, 2016 (Check No. 1042), and the
> other which arrived in the mail on April 22, 2016 (Check No. 1051).

> . . . GRRC delivered 26 straight barriers on April 20, 2016; 26 straight
> barriers on April 21, 2016; and 26 Straight barriers on April 22, 2016. Check
> No. 1051 was dated April 20, 2016, and received by GRRC on April 22, 2016.
> Check No. 1042 was dated April 21, 2016, and received by GRRC on April
> 22, 2016. Accordingly, the delivery of the 78 new straight barriers (valued
> at $944.00 each) and the receipt of Check No. 1042 and Check No. 1051,
> which occurred within days (and even hours) of each other, were, in fact, a
> substantially contemporaneous exchange.

Citing DeGiacomo v. Draper Knitting Co., Inc., (In re Jannel Indus., Inc.), 245 B.R. 757,

760 (Bankr. D. Mass. 2000), it adds:

> based on the contemporaneous communications between Ray and Casey,
> Casey's promise to make additional payments, GRRC's substantially
> contemporaneous delivery of barriers in relation to such promise and
> payment of Check No. 1042 and Check No. 1051, and the parties' broader
> understanding throughout the relationship that timely payments were
> critical, BGP intended to exchange payment through Check No. 1042 and
> Check No. 1051 to GRRC in exchange for the continued deliveries on April
> 20, 21, and 22, 2016.

With respect to its § 547(c)(2) defense, GRRC, citing Wiscovitch–Rentas v. Villa

Blanca VB Plaza LLC (In re PMC Mktg. Corp.), 543 B.R. 345 (B.A.P. 1st Cir. 2016),

recognizes that to prevail on its ordinary course defense it must establish a baseline of

past practices between itself and the Debtor and that the relevant payments were

ordinary in relation to these past practices. It references a list of factors that courts consider in determining ordinary course, namely "the amount transferred, the timing of the payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was effected." Id. at 358 (citations and quotations omitted).  In addition, it emphasizes that a short business relationship will not preclude a successful defense under § 547(c)(2).

In support of its defense, GRRC points to its net 30 days payment term and GRRC's practice of invoicing BGP on approximately a weekly basis during the relationship.  It also argues that Check No. 1005 and Check No. 1025 established a sufficient baseline as both payments were made by check, paid an entire single invoice at one time, and were received by GRRC in the mail with the invoice BGP intended to pay.  It summarizes the payments as follows:

| Check # | Invoice # | Invoice Date | Amount | Check Received | Check Cleared | Days to Pay |
|---------|-----------|--------------|--------|----------------|---------------|-------------|
| 1005 | 56213 | 3/7/2016 | $48,144.00 | 3/23/2016 | 3/24/16 | 16 |
| 1025 | 56267 | 3/28/2016 | $133,399.00 | 4/2/2016 | 4/5/16 | 5 |

Owing to its significant startup costs and ongoing expenses, as well as the substantial size of the contract in relation to its prior contracts, GRRC closely monitored the BGP receivables and regularly contacted BGP to urge payment.  Accordingly, GRRC asserts that "[c]onsistent with those communications, under the specific facts of this case, the ordinary baseline of conduct between the parties included for BGP to make payments only after GRRC had communicated with BGP to request such payments."

Based upon this baseline, GRRC contends that the timing and circumstances establish that the debt of $128,326.63 represented by Invoice No. 56343 was incurred in the ordinary course of affairs between BGP and GRRC and that the payment of $128,326.63, represented by Check No. 1051, was made in the ordinary course of business between BGP and GRRC.  GRRC points to emails dated April 4, 2016 and April 13, 2016 sent by Ray to Casey, and the April 19, 2016 email sent by Ray to Hughes regarding past due invoices, as well as Ray's voicemail and email to Casey on April 20, 2016, followed by another email on April 21, 2016 and a phone call on April 21, 2016 in which Casey reported that BGP had put a check in the mail in the approximate amount of $128,000.00. GRRC emphasizes that the repeated emails and calls were part of the usual activity precipitating payment from BGP and did not deviate from the usual collection activities. It also emphasizes that it did not "require or implement any payment plan or payment terms with BGP different than the contractual terms" and it never required BGP to pre-pay for barriers before GRRC would make a delivery, to pay cash-on-delivery for barriers, or to pay by wire instead of by check.  It summarizes its argument by noting that it "applied Check No. 1051 to Invoice No. 56343, which was in the same amount as Check No. 1051 and which BGP had intended to pay with Check No. 1051 by including that invoice in the mail package with the check."  It also asserts BGP paid Invoice No. 56343 with Check No. 1051 nine days after the April 13, 2016 invoice date.  Citing Miller v. Perini Corp. (In re A.J. Lane & Co., Inc.), 164 B.R. 409, 414 (Bankr. D. Mass. 1994) ("Timely payments made in accordance with applicable payment terms are of course the quintessential examples of 'normal financial relations[.]'"), it adds that the duration is

consistent with Check No. 1005 (16 days) and Check No. 1025 (five days), and "identical to Check No. 1005 and Check No. 1025," because Check No. 1051 involved payment made by check towards a single invoice at a time received through the mail."

GRRC also argues that Check No. 1051 also paid a debt (invoice) incurred in the ordinary course between the parties through GRRC's regular invoicing practices, which did not change throughout the relationship. Thus it urges the Court to conclude that Check No. 1051 is not avoidable in its entirety pursuant to § 547(c)(2).

GRRC, while noting that that Check No. 1042 paid multiple invoices and that it did not receive the check in the mail as Ray picked it up in person in Boston, Massachusetts at approximately 8:15 a.m. on April 22, 2016, maintains that "[t]hese changes . . . only occurred by chance, not through any other unusual collection steps between the parties." It points out:

> Ray did not go to Boston to demand payment in-person or for any other collection activity reason. And other than these innocuous circumstances, Check No. 1042 was paid consistent with the pre-preference period payments and in response to debt incurred in the ordinary course, including payment by check upon a request from GRRC.

Finally, with respect to its § 547(c)(4) defense, it maintains that it received Check No. 1042 on April 22, 2016 at approximately 8:15 a.m. when Ray picked up the check at BGP's office and Check No. 1051 on April 22, 2016 at approximately 11:00 a.m. when that check arrived in the mail at GRRC's office. In addition, it argues that the evidence establishes that, on April 22, 2016, GRRC delivered eleven straight race barriers to BGP at 2:30 p.m. or later. Thus, it contends that it delivered subsequent new value to BGP in the form of 11 straight barriers valued at $944.00 each after GRRC received Check No.

35

1042 and Check No. 1051.  Accordingly, it argues it is entitled to a new value credit under

§ 547(c)(4) of $10,384.00.

   2. The Plaintiff

   With respect to GRRC's preference defense under § 547(c)(1), the Plaintiff, citing 5

*Collier on Bankruptcy*, 547.04[1][a], at 547-45 (Alan N. Resnick & Henry J. Sommer, eds.,

16th 2018), McClendon v. Cal-Wood Door (In re Wadsworth Bldg. Components, Inc.), 711

F.2d 122, 124 (9th Cir. 1983), and Keydata Corp. v. Boston Edison Co. (In re Keydata

Corp.), 37 B.R. 324, 327 (Bankr. D. Mass. 1983), maintains that GRRC did not demonstrate

that the parties intended that any portion of the April 22 payments was to be

contemporaneous with the delivery of race barriers, noting that even GRRC's "own

records show that the payments were applied to invoices for Race Barriers that were

already delivered, regardless of whether the Trustee's or Roberts' assertions about which

invoice was paid with Payment Three [i.e., Check No. 1051 in the amount of $128,326.63]

is considered to be correct."

   The Plaintiff contends that GRRC failed to meet its burden that the April 22, 2016

payments were made in the ordinary course of business under § 547(c)(2)(A).

Specifically, it asserts that GRRC did not establish a baseline ordinary course of business

between the parties to which the April 22, 2016 payments can be compared.  In the

Plaintiff's view, GRRC issued invoices to BGP totaling $1,105,439.89 between January 29,

2016 and April 30, 2016, BGP made only four payments totaling $459,869.63, and, prior

to the preference period, BGP and GRRC "never established a baseline course of dealing

that was 'ordinary.'"  The Plaintiff argues:

BGP immediately fell behind on its obligations to Roberts, failing to make payment within 30 days of the invoice date as required by the Contract. Roberts never agreed to BGP's late payments either implicitly or explicitly. It protested BGP's late payments and requested additional payments during the pre-Preference Period. The lack of an ordinary course of dealings prior to the Preference Period is further evidenced by a lack of agreement between Roberts and BGP as to the application of BGP's payments to the invoices.

In addition, the Plaintiff maintains that the parties' pre-preference period and preference period dealings differed significantly. He contends that application of BGP's payments by GRRC differed between the two periods, based upon the application of the Check No. 1051 in the amount of $128,326.63 to Invoice No. 56246, dated March 19, 2016 in the sum of $136,928.63, leaving a $8,602.00 balance and resulting in an invoice date to check delivery date period of 34 days, rather than nine computed by GRRC.  In sum, the Plaintiff asserts that "[d]espite the older, past due invoices, before the Preference Period, BGP's payments were applied based on the Debtor's unilateral decision to pay new invoices. During the Preference Period, Roberts applied the payments to the oldest invoices."  He further argues that Ray's testimony regarding the application of Check No. 1051 to Invoice No. 56343 in the same amount was not credible in view of his April 25, 2016 and May 3, 2016 communications in which Ray referenced application of the payment to older invoices.

The Plaintiff also maintains that the April 22, 2016 payments were made in response to unusual collection efforts.  The Plaintiff argues with reference to Ray's numerous emails as follows:

Prior to the Preference Period, Roberts took no action to compel timely payments.  During the Preference Period, by contrast, Roberts' efforts to

collect BGP's debt were markedly more intense. In the pre-Preference Period, Roberts did not engage in the type of collection activities that occurred during the Preference Period. During the Preference Period, Roberts: (i) threatened to cease production, (ii) insisted that the Debtor make a second, larger payment in addition to the one just made, more than doubling BGP's total payment in the aggregate, (iii) insisted on picking up a check in person, (iv) contacted a third party to seek assistance in collecting a check; and (v) demanded that all invoices over thirty (30) days be paid at once. Clearly during the Preference Period, communications from Roberts took on an urgency not seen prior. . . .  Given the size of the Contract for Roberts, it is clear that each day that the Debtor's payments exceeded 30 days was a day that Roberts could not tolerate.

In support of his contention that there were unusual collection efforts, the Plaintiff relies upon the April 20, 2016 email from Ray to Casey in which he noted that the sum of $280,357.63 had been outstanding for more than 30 days, that GRRC would be stopping production until a payment schedule could be "worked out," and that he was driving to Boston to pick up a check.

Addressing GRRC's new value defense under § 547(c)(4), namely that it is entitled to a credit of $10,384.00 because it delivered race barriers with that value on April 22, 2016 either after it received Check No. 1051 in the mail on April 22, 2016 around 10:30-11:00 a.m. or because Ray picked up Check No. 1042 at approximately 8:15 a.m. on that day, the Plaintiff maintains GRRC's records were insufficient for a determination of the time its deliveries arrived in Boston.  The Plaintiff argues that where BGP representatives did not meet GRRC drivers, "[i]t is reasonable to infer that the Race Blocks were delivered prior to Roberts' receipt of the April 22, 2016 payments."

## V. DISCUSSION

A. <u>Section 547(b) and the Issue of Insolvency</u>

Subject to certain exceptions, § 547(b) provides:

The trustee may avoid any transfer of an interest of the debtor in property -

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made –
    (A) on or within 90 days before the date of the filing of the petition . . .;
(5) that enables such creditor to receive more than such creditor would receive –
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The Trustee bears the burden of proving, by a preponderance of the evidence, each of the elements identified in § 547(b) and, once the Trustee has met his burden, the defendant bears the burden of proving any affirmative defenses set forth in Bankruptcy Code section 547(c). *See* 11 U.S.C. § 547(g). *See also* <u>Geltzer v. Fleck (In re ContinuityX, Inc.)</u>, 569 B.R. 29, 33–34 (Bankr. S.D.N.Y. 2017) (citing <u>Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)</u>, 78 F.3d 30, 34 (2d Cir. 1996)). Once a trustee has met his burden under § 547(b), and, in the absence of any affirmative defenses, the trustee may recover the transferred property or its value pursuant to § 550. *See* <u>In re ContinuityX, Inc.</u>, 569 B.R. at 34 (citing 11 U.S.C. § 550).

The only issue in dispute with respect to the elements of a preference under § 547(b) is the Debtor's insolvency. Pursuant to 11 U.S.C. § 547(f), "the debtor is presumed

to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." Moreover, for purposes of avoiding preferential transfers, "the only measure of insolvency is balance sheet insolvency. *See* 11 U.S.C. § 101(32)(A) (defining insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation"); *see also* Weisfelner v. Blavatnik (In re Lyondell Chem. Co.), 567 B.R. 55, 120 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) (citing In re Roblin Indus., Inc., 78 F.3d at 35).

The Plaintiff relied upon the presumption of insolvency and the expert report and testimony of Jalbert. GRRC relied upon the expert report and testimony of Stickney. The Court concludes that the expert report and testimony proffered by Jalbert was compelling, particularly where, in formulating his opinion of the Debtor's solvency, he demonstrated a complete and thorough understanding of the circumstances surrounding the proposed race and the myriad permits and costs required for racing automobiles at high speeds through the streets of South Boston. In contrast, Stickney's testimony was flawed and unconvincing in several respects and was not credible.

In assessing expert testimony, the Court is mindful, that "[e]xpert opinions are not reliable if they are not 'based on sufficient facts or data' or are not 'the product of reliable principles and methods properly applied.'" In re Lyondell Chem. Co., 567 B.R. at 112-13 (quoting Lippe v. Bairnco Corp., 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 F.App'x. 274 (2d Cir. 2004)). *See also* In re Rezulin Prods. Liab. Litig., 369 F. Supp.2d 398, 425 (S.D.N.Y. 2005) (rejecting expert testimony where "the plaintiffs' experts have ignored a large amount of information that calls many aspects of the [expert's analysis] into question"

40

and explaining that "any theory that fails to explain information that otherwise would
tend to cast doubt on that theory is inherently suspect"). According to the court in
Lyondell,

> [C]ourts have rejected or discredited expert testimony where an expert's
> analysis utilizes "cherry-picked" data to distort results or produce
> misleading results. *See, e.g.*, E.E.O.C. v. Freeman, 778 F.3d 463, 469–70 (4th
> Cir. 2015) ("'Cherry-picking' data is essentially the converse of omitting it:
> just as omitting data might distort the result by overlooking unfavorable
> data, cherry-picking data produces a misleadingly favorable result by
> looking only to 'good' outcomes."); Barber v. United Airlines, Inc., 17
> Fed.Appx. 433, 437 (7th Cir. 2001) ("Because in formulating his opinion [an
> expert] cherry-picked the facts he considered to render an expert opinion,
> the district court correctly barred his testimony because such a selective use
> of facts fails to satisfy the scientific method . . . ."). Similarly, an expert lacks
> credibility when an underlying solvency analysis is based on projections
> that "fly in the face of what everyone . . . believed" during the time period
> in question. VFB LLC v. Campbell Soup Co., No. CIV. A. 02-137 KAJ, 2005
> WL 2234606, at *29 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007).

567 B.R. at 113.

The Court concludes that the Plaintiff sustained his burden of establishing
insolvency by a preponderance of the evidence based upon the presumption and the
expert testimony of Jalbert.  GRRC did not prove that the Debtor was solvent on April 25,
2016, the date selected by Stickney as the initial test date and the date that the two checks,
Check Nos. 1051 and 1042, cleared the bank. The Court agrees with the Plaintiff's
contentions that Stickney's assumptions and use of going concern valuations were
unwarranted, unsupported, and overlooked "red flags" that would have undermined his
assumptions and methodologies.   In particular, the Court concludes that Stickney's
projections "based upon the budget updated on December 15, 2016, by BGP," were
unreliable because the Debtor's budget was unreliable.  Accordingly, the Court rules that

Stickney's conclusions that BGP had over $17 million in equity and that its income statement would have presented net income of over $10 million at the conclusion of the race do not establish that the Debtor was solvent. Indeed, he appears to have "cherry picked" information that flew in the face of overwhelming evidence that BGP should not have been valued as a going concern.

GRRC criticized Jalbert's references to various license requirements for insurance and letters of credit. Nevertheless, based upon the litany of problems he identified from his review of numerous documents, Jalbert correctly determined that use of a liquidation value for the assets set forth on a recreated balance sheet was appropriate, noting that the Debtor did not maintain organized financial records or a system to prepare financial statements. Using as a starting point Stickney's balance sheet dated April 25, 2016, Jalbert made numerous adjustments "to properly reflect the value of BGP's assets at liquidation value, and to reflect liabilities that existed as of April 22, 2016, but that were NOT recorded by Stickney."

In particular, Jalbert focused on Stickney's position that the sponsorship receivables were assets and his assumption that they would be collected, despite the potential requirement of refunds or conditions that such pledges were not earned until the race was held. Jalbert concluded that the cash received by BGP required a reserve for refunding and a corresponding reservation or liability entry on the balance sheet to reflect their status as contingent assets in the insolvency analysis. Jalbert also criticized Stickney's treatment of prepaid expenses and the valuation of the Event License based upon future cash flow, as well as his failure to consider circumstances such as the denial

of the event permit by the Boston Conservation Commission.  To repeat, Jalbert correctly

valued the Event License at zero because by April 22, 2016 it was clear the race was not

going to be held.  Jalbert's conclusion that BGP was "without a doubt," insolvent by

$5,801,071.00 on April 22, 2016 and remained insolvent up until the commencement of its

bankruptcy case was well supported by the evidence he considered and methodologies

he employed.

Based upon the experts' reports and their testimony, the Court gives little weight

to Stickney's analysis.  The Court concludes that Jalbert's experience, thorough review of

relevant materials, and proper adjustments to the balance sheet prepared by Stickney

compel the conclusion that the Plaintiff sustained his burden of proof on the issue of

insolvency.

B. GRRC's Defenses under Section 547(c)

Pursuant to 11 U.S.C. § 547(g), the creditor has the burden of proving the

nonavoidability of a transfer under subsection (c).  Thus, GRRC has the burden of proving

its defenses under § 547(c)(1), (c)(2), and (c)(4).

1. Section 547(c)(1)

Section 547(c)(1) provides that "[t]he trustee may not avoid under this section a

transfer - (1) to the extent that such transfer was - (A) intended by the debtor and the

creditor to or for whose benefit such transfer was made to be a contemporaneous

exchange for new value given to the debtor; and (B) in fact a substantially

contemporaneous exchange."  11 U.S.C. § 547(c)(1).  Section 547(c)(1) is intended "to

encourage creditors to continue to deal with troubled debtors by prevent[ing] trustees

from avoiding payments that were clearly intended to support a new transaction, instead of an antecedent debt." Campbell v. The Hanover Ins. Co. (In re ESA Envtl. Specialists, Inc.), 709 F.3d 388, 397-98 (4th Cir. 2013), *cert. denied,* 571 U.S. 881 (2013) (internal quotations omitted). According to the court in Gold v. Myers Controlled Power, LLC (In re Truland Grp., Inc.), 588 B.R. 447 (Bankr. E.D. Va. 2018), "[t]he key question is "whether the alleged preferential transfer diminished the debtor's estate, i.e., whether the debtor in fact acquired a new asset that offset the loss in value to the estate when the debtor transferred existing assets to acquire the new asset at issue." Id. at 458 (citing ESA Envtl. Specialists, Inc., 790 F.3d at 398).

GRRC's ability to establish the defense under § 547(c)(1) turns on the intent element of §547(c)(1)(A), specifically whether the parties' intended that Check Nos. 1042 and 1051 to be a contemporaneous exchange for new value. According to the court in In re Jannel Indus., Inc., 245 B.R. at 760, a case cited by GRRC, "the statute does not require intent to apply the payment to the new value. Rather, it requires only intent to exchange payment (on old debt) for new value. The fact that the parties intended to apply the payment to an antecedent debt does not remove the payment from the protection of this defense." Id. The decision in Jannel, however, has been criticized. In Bogdanov v. Avnet, Inc., the court stated:

> The contemporaneous exchange defense, generally speaking, protects transactions in which the debtor's transfer (i.e. payment) is on account of what might be technically described as "antecedent debt," but debt that arises from the new value for which payment is being made. Payments on already outstanding accounts receivable, that in turn trigger the extension of new credit with respect to new value generally cannot be claimed by a creditor to be a "contemporaneous exchange," beyond a Trustee's

avoidance power. In determining whether the transaction at issue here falls within the intended scope of § 547(c)(1), the bankruptcy court properly evaluated the parties' actual intent by looking at which debt(s) Amherst intended to, and did, pay. Notwithstanding some authority to the contrary, *see e.g.* In re Jannel Indus., Inc., 245 B.R. 757, 759–60 (Bankr. D. Mass 2000), courts, as well as leading commentary in the field, generally support the bankruptcy court's approach here. *See, e.g.*, In re Dooley Plastics Co., 185 B.R. 389, 395 (Bankr. D. Mass. 1995); In re Pearson Indus., Inc., 142 B.R. 831, 846 (Bankr. C.D. Ill. 1992); 5 *Collier on Bankruptcy* ¶ 547.04[1][a], at 547–47 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.2009).

A debtor who, as in this case, intends to pay old invoices and a creditor who accepts the debtors' payment and applies it to resolve old invoices, and then gives new value on a credit basis, certainly cannot be said to have "intended" a contemporaneous exchange as a matter of law, and will not, generally, succeed in preventing avoidance of the preferential payment by the debtor's trustee under that defense. That is not to say, of course, that under different factual circumstances, a court could not find, as a factual matter, that although the parties seemingly allocated a preferential payment to resolve outstanding invoices relative to antecedent debt, their actual intent, as a factual matter, was to contemporaneously exchange payments (however allocated) for goods. But that was not the bankruptcy court's factual finding here, and its finding is supported by the evidence of record.

Bogdanov v. Avnet, Inc., No. 10-CV-543-SM, 2011 WL 4625698, at *10 (D.N.H. Sept. 30, 2011). This Court finds the reasoning of the district court in Bogdanov to be compelling and is unpersuaded by the reasoning in Jannel. In the absence of any direct evidence of the parties' intent, the Court concludes that GRRC has failed in its burden of establishing a defense to preference liability under § 547(c)(1).

2. The Section 547(c)(2) Defense

The U.S. Bankruptcy Appellate Panel of the First Circuit addressed the ordinary course of business defense in PMC Mktg. Corp., stating:

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") "significantly amended the ordinary course of business

exception in § 547(c)(2)." In re Affiliated Foods, 750 F.3d at 717 (citation omitted). "The prior version required a creditor seeking to avoid preference liability to prove three elements: (i) that the preferential transfer paid a debt incurred in the ordinary course of the debtor's business; (ii) that it was 'made in the ordinary course of business ... of the debtor and the transferee'; and (iii) that it was made 'according to ordinary business terms.' " Id. (citations omitted). "While the preferred creditor must still prove that the debt was incurred in the ordinary course of the debtor's business," under amended § 547(c)(2), "the remainder of the test is now disjunctive." Id. at 718 (footnote omitted). The creditor must now "prove that the transfer either was made in the 'ordinary course of [its] business' with the debtor, or that it was made 'according to ordinary business terms.'" Id. The former requirement is referred to as the "subjective test," articulated in § 547(c)(2)(A); the latter is known as the "objective test," set forth in § 547(c)(2)(B). Davis v. R.A. Brooks Trucking, Co. (In re Quebecor World (USA), Inc.), 491 B.R. 379, 385 (Bankr. S.D.N.Y. 2013) (citation omitted) (internal quotations omitted).

PMC Mktg. Corp., 543 B.R.at 356–57 (footnote omitted). As the court observed in PMC Mktg Corp., "the hallmark of a payment in the ordinary course is consistency with prior practice," id. at 357, and "[t]he 'consistency' analysis requires the preference defendant to establish a 'baseline of dealing' between the parties over a historical period,' 'which should be 'well before' the preference period.'" Id. at 358 (citations omitted). Nevertheless, the U.S. Court of Appeals for the Tenth Circuit has observed:

> [A] first-time transaction can qualify for the exception. See Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys. Inc.), 482 F.3d 1118, 1125 (9th Cir. 2007) ("We agree that first-time transactions may satisfy the requirements of [the exception]."); Kleven v. Household Bank F.S.B., 334 F.3d 638, 642 (7th Cir. 2003); Gosch v. Burns (In re Finn), 909 F.2d 903, 908 (6th Cir. 1990) ("Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time."). After all, the statute refers to the "ordinary course of business or financial affairs of the debtor and the transferee," not between the debtor and the transferee. 11 U.S.C. § 547(c)(2) (emphasis added); see Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry Co.), 92 B.R. 737, 740 (Bankr. W.D. Mich. 1988). Our interpretation also fits the purpose of the exception. As the Ninth Circuit wrote:

> With the "ordinary course of business" exception, Congress aimed not to protect well-established financial relations, but rather to "leave undisturbed normal financial relations, because [the exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."

In re Ahaza Sys., Inc., 482 F.3d at 1125 (quoting Union Bank, 502 U.S. at 160, 112 S.Ct. 527). And we agree with the Seventh Circuit that "'the court can imagine little (short of the certain knowledge that its debt will not be paid) that would discourage a potential creditor from extending credit to a new customer in questionable financial circumstances more than the knowledge that it would not even be able to raise the ordinary course of business defense, if it is subsequently sued to recover an alleged preference.'" Kleven, 334 F.3d at 643 (quoting Warsco v. Household Bank F.S.B., 272 B.R. 246, 252 (Bankr. N.D. Ind. 2002)).

Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.), 798 F.3d 983, 989 (10th Cir. 2015).

In view of those precepts, the Court concludes that GRRC established a baseline of payments made by BGP before the preference period whereby BGP paid the full amount of invoices that were between 5 and 16 days old.  With respect to Check No. 1051 in the sum of $128,326.63, which GRRC received in the mail on April 22, 2016, together with Invoice No. 56343 dated April 13, 2016, GRRC applied the payment to that invoice consistent with its pre-preference period practice.  The Court concludes that the nine day interval also is consistent with the earlier intervals.

The Plaintiff attempts to undermine Ray's testimony that he was mistaken when he stated in communications with BGP that Check No. 1051 was applied to invoices predating the April 13, 2016 invoice.  In view of GRRC's trial balance and Ray's demeanor as a witness, the Court accepts his testimony that his controller applied the $128,326.63

payment in the same manner as the $48,144.00 payment and the $133,399.00 payment. Ray was a knowledgeable and credible witness. The Plaintiff did not call GRRC's controller to challenge Ray's testimony. Accordingly, the Court concludes that GRRC satisfied its burden of proof under § 547(c)(2) with respect to the April 22, 2016 payment in the sum of $128,326.63 that was mailed to GRRC. Although the baseline established by GRRC was circumscribed owing to the limited number of payments made by BGP to GRRC, the decision of the Tenth Circuit in In re CW Mining Co., which is consistent with those of the Seventh and Ninth Circuits, establishes that even a first time transaction can qualify for the exception. 798 F.3d at 989.

The Court concludes, however, that GRRC did not satisfy its burden of proof with respect to the payment of $150,000.00 that GRRC applied to old invoices. Ray picked up Check No. 1042 in Boston after emailing Casey that GRRC was contemplating ceasing production of race blocks in the absence of payment. While GRRC contends Ray's decision to pick up the payment in Boston was a mere coincidence as Ray was in Boston to check out a new delivery location, the Court concludes that the circumstances surrounding that payment are unlike the baseline and compel the conclusion that it was not a transfer made in the ordinary course of business between the Debtor and GRRC.

3. The Subsequent New Value Defense under Section 547(c)(4)

The Court incorporates by reference its statement of applicable law set forth in Cruickshank v. George R. Roberts Co. (In re Boston Grand Prix, LLC), 2018 WL 4030731, at *8-9. In that decision, the Court concluded "that there is no dispute of material fact that GRRC delivered 105 Race Blocks to the Debtor after the April 22, 2016 payments; that

48

the Race Blocks were not secured by an otherwise unavoidable security interest; and that

the Debtor did not make an otherwise avoidable transfer to, or for the benefit of GRRC."

GRRC now raises a defense with respect to an additional 11 straight race blocks that were

delivered in the afternoon of April 22, 2016 after Ray picked up Check No. 1042 at

approximately 8:15 a.m. on April 22, 2016.  The date for determining the time when new

value is provided by the creditor to the debtor is when the new value is delivered.  *See*

Rifken v. Entec Distrib., LLC (In re Felt Mfg. Co., Inc.), No. 05-13724-JMD, 07-1170, 2009

WL 3348300, at *12 (Bankr. D.N.H. Oct. 16, 2009).

Based upon Ray's unrebutted testimony, this Court can easily infer that the 11

straight race blocks were part of the second set of deliveries made on April 22, 2016.  The

drivers delivering the first set of race blocks would have left Maine between 4:00 and 4:30

a.m. on April 22, 2016, dropped off their loads and returned to Maine, thereafter

departing from Maine for Boston after reloading.  Under any reasonable scenario, that

would have occurred after 8:15 a.m. when Ray picked up a check from the offices of BGP.

Accordingly, the Court finds that GRRC established an additional subsequent new value

defense with respect to the 11 race blocks delivered in the afternoon on April 22, 2016

with a value of $10,384.00, resulting in a total new value credit of $109,714.00.

## VI. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of the Trustee
in the sum of $139,616.00.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: April 29, 2019